74483, 74484. EMORY UNIVERSITY v. HOUSTON;
and vice versa.
(364 SE2d 70)

BEASLEY, Judge.

We granted the application of Emory University to appeal an order involving discovery disputes between it and the plaintiff below, Houston. Houston has cross-appealed from that order with regard to disputes not only with Emory University, but also with Emory Clinic, a co-defendant below, and with regard to the deposition testimony of Dr. David Campbell, one of the partners in the Emory Clinic.

Emory University is a not-for-profit corporation organized under the laws of Georgia. It operates the Emory Hospital and the Emory University School of Medicine as components of the corporation, not as separate entities. The Emory Clinic is a partnership composed of doctors who are members of the faculty of the Emory University School of Medicine. It operates as a partnership and works from facilities connected with the hospital, for which it pays the university a sum representing the value of the facilities provided. Dr. Cavanaugh, also a co-defendant below, was a member of the faculty, a partner in the clinic, and also chairman of the ophthalmology department of the hospital.

On September 11, 1983, Houston, a patient of Cavanaugh's through his practice at the clinic, was admitted to the hospital for the purpose of undergoing surgery on his right eye. The consent form signed by him was so limited. The next day, Cavanaugh operated on Houston's left eye and did not operate on the right.

In addition to his claims for medical malpractice, breach of contract, and battery, Houston has sued for fraud, deceit, and conspiracy. He alleges that documents were falsified to make it appear that Cavanaugh meant to operate on the left eye and that such surgery was needed, and also that the patient was misinformed about the actual surgery on the left, its need and consequences.

Along with the complaint and summons, Houston served on the

clinic and on the university requests for production of various documents, including requests directed to both entities requesting all correspondence relating to the events referred to in the complaint; all documents, recordings, et cetera, prepared during any investigation of the events related in the complaint; and all documents referring to Houston's condition. Also requested were the bylaws of the clinic and all documents received by the university concerning any investigations of the events involving plaintiff.

The clinic filed a timely written response to the requests, asserting the attorney/client privilege, the work product rule, and objecting further "to the extent that the [request] calls for disclosure of documents generated by a medical peer review committee and which are, as such, privileged and confidential by virtue of, *inter alia*, the provisions of OCGA § 31-7-130 *et seq.*"

Although the university timely answered the complaint, through inadvertence of counsel it did not serve its written response to the requests until five months later. Although the response is not in the record, portions are quoted in other pleadings, and it is apparently not contested that it contained claims of the attorney/client privilege and objected to "the extent any such documents may not be subject to discovery under Georgia peer review or medical review committee statutes. . . ."

Houston filed motions to compel both entities, claiming that the university and clinic had waived the peer review/medical review privilege, that the university also had lost the right to make any objections by not timely filing a written response containing the objections, and that the committees' activities prior to March 21, 1984, were not covered by the applicable statutes.

The affidavits filed in opposition to these motions and the answers to interrogatories also filed with the court reflected the following. In July 1985, Dr. Perdue, who was the executive director and managing partner of the clinic, medical director of the hospital, and associate dean of the school of medicine of the university, ordered that the Professional Standards and Ethics Committee, chaired by Dr. Tindall and including nine other doctors, convene to investigate certain allegations against Dr. Cavanaugh regarding care administered at the clinic and the hospital. This committee, which we will refer to as the Tindall/standards committee, was a standing committee of the clinic, with members annually appointed by the clinic's executive director and approved by the clinic's administrative committee.

A second committee, the Section of Ophthalmology Quality Care Review Committee, was composed of ophthalmologic specialists and chaired by Dr. Waring. It consisted of Drs. Waring, Campbell, Specter, Wilson, Stulting, Coles, and Meredith. While affidavits submitted by defendants indicate that it was jointly approved by and registered

with the hospital and the clinic, and was approved to operate as a peer review organization within the hospital and the ophthalmology section of the clinic, the specifics of its formation and operation are not revealed. It will be referred to as the Waring/care review committee. It did not meet or commence any aspect of its investigation into the Houston incident until after March 1984, according to Dr. Waring's affidavit.

There was also a third committee of the clinic, the "oversight committee," composed of Drs. Wilson, Meredith, and Coles, who were also members of the Waring/care review committee. Although information relating to this committee is minimal, it apparently was formed in October 1984 pursuant to the clinic partnership agreement.

Houston deposed Dr. Campbell, a partner in the clinic and a member of the Waring/care review committee. He testified that the ophthalmology section of the clinic was advised of the incorrect eye surgery at a faculty meeting the week after its occurrence, i.e., late September 1983. Campbell moved that a committee be formed to look into this incident and other practices of Dr. Cavanaugh's of which he was aware. He stated that he did not request that the committee be a peer review committee, although the doctors named by him as members of the committee are, with him, some of those on the Waring/care review committee. Numerous questions asked during the deposition of Dr. Campbell were objected to by his attorney as well as the clinic's and university's attorneys on the grounds that, since he was a member of the Waring/care review committee, it was impossible for him to separate what he learned as a committee member and what he learned as an individual. Houston filed a motion to compel regarding Dr. Campbell, too, the denial of which is part of his cross-appeal.

Houston also deposed Dr. Cavanaugh's physician's assistant and his student fellow, who were both present during the operation. The physician's assistant stated that shortly after the surgery Dr. Stulting and Dr. Waring both asked her to collect and bring to them any of Dr. Cavanaugh's files where changes had been made in the records. She left Dr. Cavanaugh in March 1984. The fellow was also asked by Dr. Waring and Dr. Wilson to bring them any altered files prior to his leaving Dr. Cavanaugh in November 1983.

The order appealed from held that the privileges established by OCGA §§ 31-7-130 and 31-7-140 et seq. are nonwaivable; that the committees may investigate intentional conduct as well as negligent conduct; that Dr. Laney, Dr. Krause, Dr. Hatcher and the Board of Trustees were not members of any of the committees and therefore could be deposed, although they could not release any of the "written records or documents from the proceedings of the Committees . . ."; that the Waring/care review committee was a qualified committee under what is now OCGA § 31-7-130 et seq.; that Dr. Campbell could

not waive his Review Statute privilege and could testify only about his personal knowledge of the incidents; that the term "proceedings" was not limited "to the formal hearings or meetings of the Committee . . . [but] includes all of the activities undertaken and information otherwise learned by Dr. Campbell as a witness and Committee member"; that while the clinic had formed the Tindall/standards committee and was thus entitled to its findings, the hospital had not created this committee and could not claim the privilege as to it.

It is in this posture that the case comes to us.

### Case No. 74483

The university challenges the court's refusal to allow the university the privilege with regard to the Tindall/standards committee. It also contends that Dr. Laney, as president, and the other administrators should be permitted to invoke the privilege, even though not members of any of the committees.

1. Addressing these issues requires an examination of the origins and development of both OCGA § 31-7-130 et seq., the "peer review" statute, and OCGA § 31-7-140 et seq., the "medical review" statute.

The stated purpose of OCGA § 31-7-130 (formerly Code Ann. § 84-7601), enacted in 1980, is "to provide protection for those individuals who are members of Peer Review Groups which evaluate the quality and efficiency of professional health care providers and to protect the confidentiality of their records." Ga. Laws 1980, p. 1282. Review organization was originally defined as "any committee engaging in peer review established by one or more State or local trade or professional societies or associations to gather and review information relating to the care and treatment of patients by members of such societies or associations . . ." Ga. Laws 1980 at p. 1284 (former Code Ann. § 84-7602 (d)). This definition was changed in 1984 to "any panel, committee, or organization which is primarily composed of professional health care providers or which provides professional liability insurance for health care providers and which engages in or utilizes peer reviews and gathers and reviews information relating to the care and treatment of patients. . . ." Ga. Laws 1984, pp. 699, 700; OCGA § 31-7-131 (3).

OCGA § 31-7-140 was enacted in 1975 and provided the following definition: "the term 'medical review committee' means a committee of a state or local professional society or of a medical staff or a licensed hospital, . . . provided the medical staff operates pursuant to written bylaws that have been approved by the governing board of the hospital . . . , which committee is formed to evaluate and improve the quality of health care rendered by providers of health service or to determine that health services rendered were professionally

indicated or were performed in compliance with the applicable standard of care. . . ." Ga. Laws 1975, p. 739, § 1; OCGA § 31-7-140 (formerly Code Ann. § 88-3201).

Thus, until the 1984 amendment of OCGA § 31-7-131 (3), as far as applicable here, the only review committees covered by the operative privileges were those created by a professional society or trade association or one formed from a medical staff which operated pursuant to written bylaws approved by the governing board of a hospital.

This becomes important because Dr. Campbell testified that he was appointed to a committee in September 1983. Since there is no evidence indicating that the only committee of which he was a member, the Waring/care review committee, was formed by the hospital, it appears that the committee would not be covered by the privileges of the "medical review" or "peer review" statutes until the effective date of OCGA § 31-7-131 (3), which was March 21, 1984. Ga. Laws 1984, pp. 699, 701 (OCGA § 1-3-4 (a) (1)). As stated in *Hollowell v. Jove*, 247 Ga. 678, 683 (279 SE2d 430) (1981), "[i]n order for the information generated or maintained by a committee exercising review functions to be subject to the provisions of Code Ann. § 88-3201 et seq. [now OCGA § 31-7-140 et seq.], the committee must meet the qualifications set forth in Code Ann. § 88-3201 [now OCGA § 31-7-140]. The legislature could have defined a 'medical review committee' more broadly than it did. [Cit.] We must presume that its failure to do so was a matter of considered choice." See *Davenport v. Kutner*, 182 Ga. App. 467, 468 (1) (356 SE2d 67) (1987), reversed on other grounds, 257 Ga. 456 (360 SE2d 586) (1987); *Poulnott v. Surgical Assoc.*, 179 Ga. App. 138, 139 (2) (345 SE2d 639) (1986).

Consequently, the court's ruling in this discovery dispute, that the Waring/care review committee was covered by the 1980 peer review statute prior to its 1984 amendment, was in error. There is insufficient evidence in the record to determine whether the Waring/care review committee qualifies as a medical review committee, since there is no evidence that it was formed from a medical staff operating pursuant to the written bylaws of the hospital governing board. See *Poulnott*, supra at 140. Nor did the court make any such finding. There is conflicting evidence regarding whether an investigation was begun prior to the effective date of the amendment. Dr. Campbell, the physician's assistant, and Dr. Cavanaugh's student fellow all testified that there was investigation taking place prior to March 1984 at the request of Dr. Waring, although Dr. Waring's affidavit states that the committee did not conduct any proceedings until after March 1984.

2. The university also urges that, because of the overlapping nature of the faculty of the medical school, the partners of the clinic, and the staff of the hospital, the university should be entitled to the

reports of both the Tindall/standards committee and the Waring/care review committee and that they should be considered privileged through all levels of administration of the university.

This argument fails as to the Tindall/standards committee. The faculty members of the school of medicine formed a separate entity, the partnership, for purposes of practicing medicine. The partnership apparently treated patients as outpatients in its facilities, which were rented from the university, and as hospital patients. It is unclear what, if any, authority the university had over the out-of-hospital practice of the partnership. A partnership has a separate legal status, see OCGA Ch. 14-8, and the multiple roles of persons as partners in a partnership and employees or officers of a corporation do not, without more, create any relationship between the corporation and the partnership. Thus, the university was not entitled to the results of the Tindall/standards committee investigation on a privileged basis.

We look now to the trial court's holding, based on *Eubanks v. Ferrier*, 245 Ga. 763 (267 SE2d 230) (1980), that the privileges of the statutes at issue are "nonwaivable." That case determined the constitutionality of the "medical review" statute, now OCGA § 31-7-140 et seq. The Court also considered whether a member of a review committee could testify as to its proceedings and findings. It stated that "[i]t is clear that the doctors on the committee cannot be asked to answer questions or give testimony concerning the proceedings and records of the committee; nor can they be questioned concerning 'evidence or other matters produced or presented during the proceedings of such committee or as to any findings, recommendations, evaluations, opinions, or other actions' taken by them as committee members." *Eubanks*, supra at 767.

This does not, however, address the situation before us. The waiver alleged by Houston was not one attributed solely to a member of the committee, but to the hospital and the clinic, the committees' respective creators. The evidence for the allegation of waiver is an article which appeared in the Atlanta Journal/Constitution on August 4, 1985. It gives as its source for parts of the article "Emory officials" and also contains verbatim quotes from Dr. Perdue, who was a partner in the clinic and medical director of the hospital. The article refers to the Tindall/standards committee, the "oversight" committee, and a committee composed of "seven senior ophthalmologists," apparently the Waring/care review committee. The article quotes Dr. Perdue as saying that the Waring/care review committee and the Tindall/standards committee had found no intentional wrongdoing in the Houston matter.

The privileges provided by OCGA §§ 31-7-133 and 31-7-143 are "in derogation of the general policy in favor of the discovery and admissibility of probative evidence." *Hollowell*, supra at 681. They are

to be narrowly construed. *Hollowell*, supra. Prohibiting a member of the committee from testifying about the proceedings of the committee would serve the legislatively announced purpose for the privilege, i.e., fostering the delivery of quality health care services by providing a method for the in-house review of clinical work performed in a hospital or elsewhere. *Eubanks*, supra at 765 (3). But no reason appears for allowing the creator of the committee to use the positive findings of the committee to its public advantage against the patient while not allowing the injured patient to even review them. The privilege is meant to be a shield, not a sword or weapon of offense. See *In re Hall County Grand Jury Proceedings*, 175 Ga. App. 349, 350 (2) (333 SE2d 389) (1985).

Although there is no case on point with regard to waiver by the holder of the peer review/medical review committee privileges, the analysis applicable to other privileges recognized in this state is supportive. The accountant/client privilege, the attorney/client privilege, the psychiatrist/patient privilege, and the marital communications privilege may all be waived under appropriate circumstances. *Griggs v. State*, 241 Ga. 317, 318 (3) (245 SE2d 269) (1978); *Fields v. State*, 221 Ga. 307, 308 (2) (144 SE2d 339) (1965); *McCord v. McCord*, 140 Ga. 170, 174 (78 SE 833) (1913); *Marriott Corp. v. American Academy of Psychotherapists*, 157 Ga. App. 497, 501 (3) (277 SE2d 785) (1981); *Wilson v. Bonner*, 166 Ga. App. 9, 17 (5) (303 SE2d 134) (1983); see Green, Ga. Law of Evidence (2nd ed.), §§ 177, 195. We see no distinction in the rationale for the peer review/medical review privilege that would make it totally nonwaivable as a matter of legislative mandate, nor do we find any expression of legislative intent that it be so. There is not, for example, a sanction for breach of the privilege. We conclude that the trial court's holding that the privilege is nonwaivable under any circumstances to be error.

Non-waiver in the context of the statutory scheme enacted by the legislature would not make sense. The statute creates a privilege, but makes no provision for punishing one who affirmatively breaches it, such as a criminal penalty. See *Memorial Hosp. for McHenry County v. Shadur*, 664 F2d 1058, 1060 (7th Cir. 1981) discussing the Illinois criminal sanction for disclosure. To hold it non-waivable would mean that the creator could violate the privilege with impunity. We find no legislative intention to so shield a violator.

The trial court must consider whether the clinic, as to the Tindall/standards committee, and/or the university, as to the Waring/care review committee have, by their actions in making public statements concerning the findings of these committees, waived the privilege. Also, the court must consider whether the university's failure to file timely objections to the request for production was a waiver of the privilege. OCGA § 9-11-34 (b) (2); see *Fretz v. Keltner*, 109 FRD 303,

309 (8) (9) (D. Kan. 1985).

3. As to the arguments presented here concerning Dr. Laney and the other administrators who were made privy to the proceedings and findings of these two committees, we make no ruling at this juncture for the following reasons. As held in Division 1, there has not yet been an adequate showing that the Waring/care review committee was a properly formed "medical review" committee prior to March 21, 1984, so as to shield its activities prior to that time. Also, if the privilege has been waived by the entities creating the committees by affirmative use of the results, then there would be no need to further consider the question of the president and administrators.

## Case No. 74484

4. Houston, in his cross-appeal, contends that the court's holding that the privilege also covers the committees' investigation of intentional wrongdoing was error. According to the statutes, the process of peer review/medical review can be aimed at compliance by the health care facility with applicable laws, rules, and regulations, as well as whether the services rendered were indicated, and whether the cost of health care rendered was reasonable. OCGA §§ 31-7-131 (1) and 31-7-140. Billing for services not rendered and falsifying records to conceal this fact or to cover up for mistakes made in treatment would be covered by these expressed purposes. It also would be incongruous if negligent treatment were subject to investigation and correction in a privileged setting, but intentional maltreatment were not. This would not serve the purpose of allowing health care providers to attempt to protect their patients from such abuses and to take corrective actions. We agree that the privilege would cover the review of intentional misconduct.

5. In its orders concerning Dr. Campbell, the court held that he could not be compelled to produce documents or answer any questions about the proceedings and records of the committee on which he served. He was ordered to answer any questions based on his personal knowledge or information otherwise available from original sources. On the motion for reconsideration, the court further held that "proceedings" as used in the statutes "includes all of the activities undertaken and information otherwise learned by Dr. Campbell as a witness and Committee member." Houston's appeal seeks a narrower reading of "proceedings."

First, as reflected above, it is the position of the clinic that the Waring/care review committee did not meet or commence any aspect of its investigation into the Houston incident until after March 21, 1984. It is unclear from the record before us whether there was another peer review of Dr. Cavanaugh's practice outside the Houston

incident which was being conducted by this committee prior to that. If there were not, the clinic reasons, mere membership on a committee which does nothing in regard to its subject until a date certain would make privileged any information which comes to one appointed to the committee, regardless of when and how received.

OCGA §§ 31-7-133 and 31-7-143 provide that the proceedings and records of a committee are not subject to discovery and that "no person who was in attendance at a meeting of such organization [committee] shall be permitted or required to testify in any such civil action as to any evidence or other matters produced or presented during the proceedings of such organization or as to any findings, recommendations, evaluations, opinions, or other actions of such organization or any members thereof. However, information, documents, or records otherwise available from original sources are not to be construed as immune from discovery or use in any such civil action merely because they were presented during proceedings of such organization [committee], nor should any person who testifies before such organization [committee] or who is a member of such organization [committee] be prevented from testifying as to matters within his knowledge; but such witness cannot be asked about his testimony before such organization [committee] or about opinions formed by him as a result of the organization [committee] hearings."

These two statutes are aimed at protecting the formal proceedings of the committees, since both use "hearing" and "meeting" as well as "proceedings." This concept of "proceedings" is also supported by the definition of the word itself: "proceeding . . . plural . . . a record of the business transacted by a learned society or other organized group." Webster's New Twentieth Century Dictionary of the English Language (2nd ed. 1964). The legislative intent is clear that more than mere membership on a committee is required before the protections afforded by these statutes attach. See *Poulnott*, supra, dealing with a surgical conference. Since the record does not reflect what form the investigations of these committees took, this question must be returned to the trial court for further factual development, including, if appropriate, in camera review of the committees' activities to determine these issues. See *Monty v. Warren Hosp. Corp.*, 366 NW2d 198, 201 (1) (Mich. 1985).

That portion of the court's order directing Dr. Campbell to answer any questions which are based on his personal knowledge gained outside the proceedings is affirmed, while that portion defining "proceedings" to include all of his activities after his appointment to the Waring/care review committee is reversed.

*Summary*

In summary, the trial court's order holding that the Waring/care review committee was covered by the 1980 peer review statute prior to its 1984 amendment is reversed. The holding that the university was not entitled to the findings of the Tindall/standards committee is affirmed. The holding that the privilege is nonwaivable is reversed. The holding that the committees may investigate intentional wrongdoing is affirmed. The holding that "proceedings" includes all of the activities and information otherwise learned by Dr. Campbell as a witness and committee member is reversed, while the direction to Dr. Campbell to answer any questions which are based on this personal knowledge gained outside the proceedings is affirmed.

*Judgment affirmed in part and reversed in part. McMurray, P. J., and Sognier, J., concur.*

DECIDED DECEMBER 1, 1987 —
REHEARING DENIED DECEMBER 15, 1987 — 

*Sidney F. Wheeler, J. M. Hudgins IV, Earl W. Gunn*, for appellant.

*Timothy R. Brennan, Taylor W. Jones*, for appellee.