45362. EMORY CLINIC et al. v. HOUSTON.
45374. EMORY UNIVERSITY v. HOUSTON.
(369 SE2d 913)

PER CURIAM.

We granted certiorari to determine the scope of statutory prohibitions on the use of information produced by peer review and medical review groups in civil litigation. *Emory Clinic v. Houston,* 185 Ga. App. 289 (364 SE2d 70) (1987).

1. By the following clear statutory mandate, the General Assem-

bly has placed an absolute embargo upon the discovery and use of all proceedings, records, findings and recommendations of peer review groups and medical review committees in civil litigation:

> The proceedings and records of medical review committees shall not be subject to discovery or introduction into evidence in any civil action against a provider of professional health services arising out of the matters which are the subject of evaluation and review by such committee; and no person who was in attendance at a meeting of such committee shall be permitted or required to testify in any such civil action as to any evidence or other matters produced or presented during the proceedings of such committee or as to any findings, recommendations, evaluations, opinions, or other actions of such committee or any member thereof.

OCGA § 31-7-143. [1]

2. Because of this affirmative prohibition, the analysis of privileged communications of individuals is inapplicable.

A person who has nothing to waive can waive nothing. Hence, prior newspaper reports of peer review information cannot alter the prohibition on discovery of peer review information in civil litigation. This is in accord with our holding in *Eubanks v. Ferrier*, 245 Ga. 763 (267 SE2d 230) (1980), in which the plaintiff's knowledge of peer review information from a peer review committee member did not alter the prohibition. See also *Morton v. Skrine*, 242 Ga. 844 (252 SE2d 408) (1979), in which a physician was denied the use of his own investigatory file in his suit against the state regulatory board after an article concerning his investigation had appeared in the newspaper.

3. It follows that the *source* of such information is also irrelevant. Because there is, by statute, *no* discovery[2] relative to medical or peer

---

[1] The prohibitions relative to peer review organizations, found at OCGA § 31-7-133, are similar to those concerning medical review committees.

The distinction between a peer review organization and a medical review committee is understood by comparing the definitions found at OCGA § 31-7-131 (3) and OCGA § 31-7-140.

OCGA § 31-7-131 (3) provides:

" 'Review organization' means any panel, committee, or organization which is primarily composed of professional health care providers. . . ." (As amended in 1984.) (In 1983, a peer review organization was defined as "any committee engaging in peer review established by one of more State or local trade or professional societies or associations.") OCGA § 31-7-140 provides:

" '[M]edical review committee' means a committee of a state or local professional society or of a medical staff or a licensed hospital . . . or peer review committee, provided the medical staff operates pursuant to written bylaws that have been approved by the governing board of the hospital. . . ." (Enacted in 1983.)

[2] We find no merit to Houston's contention that a committee composed of ophthalmolo-

review proceedings, it matters not whether a proposed deponent is an official of Emory Clinic, of Emory University Hospital, or of Emory University.

*Judgment reversed. All the Justices concur, except Smith and Gregory, JJ., who dissent.*

SMITH, Justice dissenting.

This is not just a malpractice case. This is a case in which the plaintiff has alleged, in Count III of his complaint, fraud, deceit, and conspiracy.

Mr. Sargus Houston is an old black gentleman who was told he needed a corneal transplant in his right eye. According to a deposition of Dr. Philip Newman, the assisting physician, Mr. Houston's surgery was the last of what may have been 12 other operations performed by Dr. Dwight Cavanagh on September 12, 1983. Dr. Cavanagh operated on Mr. Houston's left eye. Mr. Houston had given his written consent for Dr. Cavanagh to operate on his right eye. Dr. Newman also stated in his deposition that Dr. Cavanagh told him to inform Mr. Houston, if he asked, that Dr. Cavanagh had decided to operate on the left eye.

Appellee Houston sued Dr. Cavanagh for malpractice and included Emory University, d/b/a/ Emory University Hospital and Emory Clinic alleging that Dr. Cavanagh and employees had engaged in a cover-up that included, among other things, falsely representing to him that there was a decision to operate on his left eye and altering his medical records to assist in the cover-up.

In a deposition by Dr. David Campbell, a professor of ophthalmology at the Emory University School of Medicine, he stated that he made a motion to form a committee to investigate Dr. Cavanagh during a faculty meeting a few days after the September 12 surgery. The committee that was formed was the Waring Committee.[1]

1. The majority opinion that leaves the court today will have a major impact on the quality of health care services in Georgia and will touch each and every person who is the recipient of health care in this state. The issues in this case are power and accountability, or more to the point, abuse of power and lack of accountability.

The legislature provided health care service providers with the power to keep their self-critical review proceedings and findings confidential. The legislature put in the hands of the health care providers the power to protect their own when they are in the process of ac-

---

gists from the medical staff of Emory Clinic (the Waring Committee) failed to comply with the statutory definition of a medical review committee pursuant to OCGA § 31-7-140 at all times relevant to this litigation. Thus all proceedings, records, findings and recommendations of this committee are immune from discovery.

[1] Two other committees investigated Dr. Cavanagh, the Tindall Committee and an oversight committee.

counting for their own. This was a wise choice on the part of the legislature, as only the health care providers are really capable of reviewing themselves and they should be accountable to themselves, absent abuse. However, the majority opinion provides the health care providers with absolute power and forecloses any outside accountability, even in the face of abuse.

Interpreting the statutes in question as "an absolute embargo upon the discovery and use of all proceedings, records, findings and recommendations of peer review and medical review committees in civil litigation[,]" amounts to an unwise, unwarranted, and perhaps unconstitutional grant of absolute power. The construction placed on the statutes by the majority negates accountability, and invites abuse. We all know the truth as stated by Lord Acton, "Power tends to corrupt and absolute power corrupts absolutely."

The *Amicus* brief of Dr. David Campbell, a member of the Waring Committee, states "that Appellants improperly utilized the peer review process to cover up numerous improprieties by Dr. Cavanagh which were identified by the Waring Committee." Dr. Campbell asserts that he

> can testify and explain how the cover-up included a press release which resulted in the August 4, 1985, *Atlanta Journal Constitution* article stating that the Tindall Committee found that Dr. Cavanagh had not committed "any impropriety"; a finding which Dr. Campbell contends to be false.

*Amicus Curiae Brief of David G. Campbell, M. D.*, pp. 8-9. Dr. Gammon was present at the September faculty meeting and he seconded Dr. Campbell's motion to investigate Dr. Cavanagh. Dr. Gammon, in his *Amicus* brief to this court, adopted and ratified all positions stated in Dr. Campbell's brief and asserted:

> Prior to the surgery on the wrong eye of Sargus Houston. . .Dr. Gammon was a partner in good standing at Emory Clinic and believes that he was held in high esteem by his colleagues. Solely as a result of his insistence upon correction of various improprieties in Dr. Cavanagh's practice, his urging of a thorough investigation of the Sargus Houston surgery and other improprieties in Dr. Cavanagh's practice, and his protest of the fraudulent cover-up of those improprieties, Dr. Gammon, by April 1986, had been removed as Chief of Ophthalmology at Egleston Hospital, removed from every committee at the children's hospital, removed as Chief of Pediatric Ophthalmology and Strabismus, evicted from his office, and told that he was finished at Emory.

*Amicus Curiae Brief of J. Allen Gammon, M.D.*, at pp. 6-7.

"The object of all legal investigation is the discovery of the truth." OCGA § 24-2-1. The doctors urge this Court to allow them to testify. They urge this Court not to construe the statute in such a way that they are forced into silence. They urge this Court to allow them to speak the truth. However, the majority holds "there is, by statute, *no* discovery relative to medical or peer review proceedings. . . ." Thus the whole truth may never be known and the appellants can create an absolute barrier to discovery by asserting that the information is "relative to medical or peer review proceedings," an *extremely broad* construction that *cannot* be found in OCGA §§ 31-7-130 et seq. or 31-7-140 et seq.

In *Hollowell v. Jove*, 247 Ga. 678, 681 (279 SE2d 430) (1981), this Court held that OCGA § 31-7-140 et seq., should be *narrowly* construed as it is in derogation of the policy favoring discovery. Although the *Hollowell* decision was addressing only OCGA § 31-7-140 et seq., its rationale is equally applicable to OCGA § 31-7-130 et seq. It is this rule of narrow construction that should have been followed in this case. The statutes were designed to protect individuals in peer and medical review committees and the confidentiality of their records when they engage in self-critical analysis, not fraud, deceit, or conspiracy.

The "absolute embargo" construction allows the worst kind of abuse, i.e., fraud, deceit, and conspiracy. The construction enhances the potential for a decrease in the quality of health care rather than fostering quality health care. We must remember that although the health care providers are unique, and must be able to police their own, they are also engaged in business. The business aspect is always interested in profits. We all know of cases in which the humanitarian aspect of big business has vanished in the light of greater profit.[2] We cannot allow health care providers to be unaccountable.

The appellants made, according to Dr. Campbell's *Amicus* brief, "false" public disclosures to the state's largest newspaper for the purpose of furthering the cover-up. The appellee did not seek discovery of the committees' findings when he filed suit, *it was only after the appellant's alleged abuse of the peer and medical review privileges became known that the appellee sought discovery of the information.*

According to the majority "prior newspaper reports of peer review information cannot alter the prohibition on discovery of peer re-

---

[2] Fifteen-year-old Terri Stubblefield was engulfed in a "ball of fire" when the Mustang II automobile she was in exploded upon impact. In the wrongful death action, there was evidence that Ford executives decided to defer adoption of protective devices on their Mustang II automobiles so that could " 'realize a design cost savings of $20.9 million. . .' " *Ford Motor Co. v. Stubblefield*, 171 Ga. App. 331, 334 (319 SE2d 470) (1984).

view information in civil litigation." The majority will allow leaks, but not discovery. The statutes provide no penalty for telling what took place in the meeting; anyone can tell without fear. That is why it is important to invoke waiver when there is a disclosure. The result of the majority holding is that each side can seek leaks and then *use the press* to air their grievances. The party with the most clout and ability to use the press effectively certainly attains not only an advantage in pre-trial negotiations but in polluting the jury pool. Under the majority opinion, discovery occurs in the public media, not the courtroom.

The "absolute embargo" construction is not in line with the legislative intent. OCGA §§ 31-7-132 and 31-7-141 provide lists of exceptions to the immunity granted. Immunity is nullified in the event of abuse. The exceptions demonstrate the legislature's intention to allow the immunities and privileges to be nullified when they are abused. Furthermore, OCGA § 31-7-142 provides that the immunities granted to committee members under OCGA § 31-7-141 shall not confer immunity from liability on a hospital or health professional while performing service other than as a member of a medical review committee. "In any case in which, except for this article, a cause of action would arise against a hospital, professional society, or any individual health professional, such cause of action shall exist as if this article had not been enacted." OCGA § 31-7-142. Furthermore, OCGA § 31-7-133 provides that the review organization's records are to be held in confidence "[e]xcept in proceedings alleging. . .violation[s] of this article. . . ." The many exceptions demonstrate the General Assembly's intention to allow the protection to be nullified when there is abuse.

The legislature never intended for the statutes to be used to prevent the truth. The goal of the legislature was to foster the delivery of quality health care services. There are some important questions that must be addressed. Is the delivery of quality health care fostered by silencing doctors who wish to testify regarding statute abuses? Is the delivery of quality health care fostered by allowing health care providers absolute power over discovery in the face of alleged abuse? Is the delivery of quality health care fostered by granting health care providers with the power to be accountable only to themselves in the face of alleged abuse? Is there any other big business in this state that is afforded the absolute power over discovery? Is there any other big business in this state that is afforded the power to be accountable only to themselves? The answers to the questions indicate that the majority is wrong. The goal of the legislature was to foster "candor" not "cover-up."

Can the public have confidence in a court that broadly construes statutes as containing "absolute embargo[s]" on discovery, etc., when: 1) the statutes are in derogation of the law in favor of discovery and

admission of probative evidence, and are to be *narrowly* construed *Hollowell v. Jove,* supra; 2) there are allegations of fraud, deceit, and conspiracy; 3) two Emory doctors wish to testify that the appellants were engaging in a cover-up; 4) the appellant's have been allowed to publically release selected findings to the state's largest newspaper and the appellee cannot even discover nor introduce evidence in court regarding what he considers to be the true findings; 5) the "absolute embargo" does not further the legislative intent to foster quality health care; and 6) the *broad* construction will allow for gross abuses of the statute and the decline of quality health in our state.

In *Eubanks v. Ferrier,* 245 Ga. 763 (267 SE2d 230) (1980) this Court upheld the constitutionality of OCGA § 31-7-143, because it fell "under the category of state regulation for the public welfare." Id. at p. 766.

> "To justify the State in . . . interposing its authority in behalf of the public, it must appear, first, that the interest of the public. . . require such interference; and second, that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals."

*Goldblatt v. Hempstead,* 369 U. S. 590, 594 (82 SC 987, 8 LE2d 130) (1962). When the construction of the means selected fails to have a real and substantial relation to the object sought to be obtained the construction must yield or the means should be declared unconstitutional. The "absolute embargo" construction placed on the statutes may result in an unconstitutional infringement on the rights of the appellee. The law as construed by the majority does not have a reasonable relation to the proper legislative purpose.

2. The Court of Appeals correctly refused to extend the protection of OCGA § 31-7-130 et seq., to the activities of the Waring Committee prior to March 21, 1984.

Before OCGA § 31-7-130 et seq., was amended, it defined peer "review organizations" to be only those organizations that had been "established by one or more state or local trade or professional societies or associations." Ga. Laws 1980 at p. 1284. Since the Waring Committee was not established by a "local trade or professional society," it could not qualify as a peer review group.

On March 21, 1984, an amendment to OCGA § 31-7-131 took effect which broadened the definition of "peer review organization" to include "any panel, committee, or organization which is primarily composed of professional health care providers. . ." The restrictive language requiring a "trade or professional society" was dropped from the statute. Since the Waring Committee was composed of doctors, it would qualify as a committee of professional health care providers

and for the protection of the statute.

The activities undertaken by the Waring Committee prior to March 21, 1984 are not immune from discovery. Exactly what activities the Waring Committee engaged in prior to March 21, is a question of fact.

3. The Court of Appeals correctly determined that the Waring Committee did not qualify for the protection granted to "Medical Review Committees."

The term "Medical Review Committee" includes a committee of a "medical staff." OCGA § 31-7-140. The Waring Committee is a committee of a medical staff of the Emory Clinic and thus could be a medical review committee as defined by OCGA § 31-7-140. However, medical review committees formed by a medical staff must "operate pursuant to written bylaws that have been approved by the governing board of the hospital. . ." Id.

There is no evidence in the record to indicate that the Waring Committee ever operated according to written bylaws or had those bylaws approved by either the governing board of the Emory University Hospital or the Emory Clinic. See *Poulnott v. Surgical Assoc.*, 179 Ga. App. 138, 140 (345 SE2d 639) (1986). We must presume that the General Assembly imposed these additional requirements on medical review committees formed by medical staffs as a matter of considered choice and we are not at liberty to dispense with statutory requirements. Committees must meet the statutory qualifications in order to be protected. *Hollowell v. Jove*, supra.

4. The Court of Appeals correctly held that Emory University cannot claim the privileges accorded to the members of the Tindall Committee.

Emory University clearly has a compelling interest in obtaining the report of the Tindall Committee because of Dr. Cavanagh's status as a faculty member of the Emory University School of Medicine and a staff member at the Emory University Hospital. However, Emory University does not qualify for the protection which may be available to the committee members and their records under either OCGA § 31-7-130 et seq., or OCGA § 31-7-140 et seq. According to the legislative intent, OCGA § 31-7-130 et seq., was enacted to protect "those individuals who are members of peer review groups. . .[and] the confidentiality of their records." Only one group of people is protected by the statute; members of peer review committees.

5. The Court of Appeals correctly held that Dr. David Campbell could answer any questions based on his personal knowledge gained outside the proceedings of the Waring Committee.

Potentially, Dr. Campbell has two sources of information concerning Dr. Cavanagh's practice. First, he has information that he acquired on his own, independent of his duties as a member of the War-

ing Committee. Secondly, he has information that he acquired while performing his duties as a member of the Waring Committee. These two spheres of knowledge overlap where Dr. Campbell learned something about Dr. Cavanagh's practice because he was a member of the Waring Committee; however, that same information could have been acquired from a source other than the Committee.

The statutes in question resolve the question of what testimony is permissible. OCGA § 31-7-133 and parallel language found in OCGA § 31-7-143 explicitly permit committee members to testify concerning matters of which they have independent knowledge. "[N]or should any person who testifies before such a organization or who is a member of such organization be prevented from testifying as to matters within his knowledge. . ." However, information which is obtainable *exclusively* through the committee is protected, barring abuse. "[S]uch witness cannot be asked about his testimony before such organization or about opinions formed by him as a result of the organization hearings." Id.

Dr. Campbell may testify to that information which he acquired while performing his duties as a member of the Waring Committee *that he could have obtained from another source.* "[I]nformation, documents, or records otherwise available from original sources are not to be construed as immune from discovery or use in any civil action merely because they were presented during proceedings of such organization. . ." Id.

6. The protections provided to peer review groups and medical review committees are provided at the expense of each individual's right to discovery, in the expectation that the general public will benefit from the self-critical analysis of the health care providers. Abuse of the privileges must cause the balance to swing back in favor of the individual. Our country was founded on the premise that power and privilege are nullified by abuses, even in the highest of places. Former President Richard Nixon can attest to that fact.

DECIDED JULY 15, 1988 —
RECONSIDERATION DENIED JULY 29, 1988.

*Allen & Ballard, Hunter S. Allen, Jr., Edward D. Flynn III,* for Emory Clinic.

*Long, Weinberg, Ansley & Wheeler, Sidney F. Wheeler, J. M. Hudgins IV,* for Emory University.

*Jones & Ludwick, Taylor W. Jones, Timothy R. Brennan,* for appellee.

*Barnes, Browning, Tanksley & Casurella, Thomas J. Casurella, Jack Spalding Schroder, Jr.,* amici curiae.