S97G1953. FULTON-DeKALB HOSPITAL AUTHORITY
v. DAWSON et al.
S97G1956. GEORGIA MEDICAL CARE FOUNDATION, INC.
v. DAWSON et al.
(509 SE2d 28)

THOMPSON, Justice.

These cases are before the Court from the grant of certiorari to the Court of Appeals in *Dawson v. Fulton-DeKalb Hosp. Auth.*, 227 Ga. App. 715 (490 SE2d 142) (1997).

Ten-year-old Antonio Dawson died in his sleep on May 15, 1992, from cardiac arrest induced by obstructive sleep apnea, a condition that causes temporary cessation of breathing during sleep. Antonio had been a patient at Fulton-DeKalb Hospital Authority d/b/a Grady Memorial Hospital (Grady). In April 1991, he was evaluated at Grady's pediatric neurology clinic and diagnosed with sleep apnea. During the spring and summer of 1991, Antonio was referred to and evaluated by several different specialty clinics at Grady, including the neurology clinic, the ear, nose and throat clinic (ENT), the nutrition clinic, the endocrinology clinic and the pediatric continuity clinic.

At an appointment at the ENT clinic on July 25, 1991, Antonio was diagnosed with enlarged adenoids and was scheduled for an adenoidectomy on August 14, 1991. Because Antonio was a Medicaid recipient, and Medicaid would not pay for the procedure without preapproval, Grady submitted a request for precertification to the Georgia Medical Care Foundation (GMCF), an organization contracted by the Georgia Department of Medical Assistance, to perform utilization review of Medicaid eligible procedures. Dr. Benjamin White, the physician who reviewed the request for approval on behalf of GMCF, determined, based on the information provided by Grady, that both an adenoidectomy as well as a tonsillectomy were indicated to correct Antonio's breathing disorder. Dr. White testified that it was his intent that this information would be relayed to the treating physician at Grady, and that both procedures would be performed. But instead of notifying Grady of Dr. White's determination, GMCF's

approval coordinator informed Grady that the scheduled surgery "is not necessary at this time for the treatment of the condition identified," and that the "information submitted does not justify the requested procedure." Dr. White acknowledged that the information conveyed to Grady did not adequately reflect his evaluation and decision. Thereafter, Antonio's mother, Sharion Dawson, received a call from a Grady representative on August 13, 1991, who advised her that the surgery scheduled for the next day had been canceled because Medicaid would not cover the cost. Ms. Dawson received no notification directly from GMCF.

Ms. Dawson instituted an action against Grady, GMCF, and Dr. White, for negligence and medical malpractice. The trial court granted summary judgment in favor of GMCF and its physician Dr. White, and the case proceeded to trial against Grady, resulting in a judgment for $26,700. The Court of Appeals affirmed the grant of summary judgment to Dr. White, but reversed summary judgment as to GMCF. *Dawson v. Fulton-DeKalb Hosp. Auth.*, supra at (1). It also determined that plaintiff was entitled to a new trial against Grady because of an erroneous evidentiary ruling. Id. at (2) (b).

We granted Grady's petition for certiorari in Case No. S97G1953 to determine whether the Court of Appeals erred in ruling that the trial court abused its discretion in allowing evidence that Ms. Dawson failed to keep certain clinic appointments at Grady in May and June 1991. Ms. Dawson's petition for certiorari was granted in Case No. S97G1956 to determine whether GMCF is entitled to civil immunity from suit under OCGA § 31-7-132.

### Case No. S97G1953

1. The trial court initially granted plaintiff's motion in limine to exclude evidence of Ms. Dawson's failure to keep certain appointments at Grady specialty clinics in May and June 1991, and of any other missed appointments prior to August 14, 1991 (the date on which plaintiff asserts Antonio's diagnosis was made). The motion was predicated on the assertion that evidence of these missed appointments is irrelevant to the issues at trial and inadmissible to prove contributory negligence on the part of the plaintiff at a time prior to Antonio's diagnosis.[1] However, after presentation of the plaintiff's case-in-chief, Grady moved the court to reconsider its rul-

---

[1] Plaintiff asserts that the evidence of missed appointments occurred prior to the diagnosis of Antonio's condition and therefore was not probative of Grady's comprehensive course of care or diligence on its part. However, Antonio's sleep apnea was actually diagnosed during his first visit to Grady on April 24, 1991, by a physician in the pediatric neurology clinic; and the missed appointments occurred thereafter.

ing. Plaintiff's negligence theory was predicated in part on the assertion that Grady failed to adequately follow up on Antonio's condition and allowed him to "fall through the cracks" of the Grady healthcare system. Grady argued that evidence of Ms. Dawson's missed appointments was relevant "not of her contributory negligence," but to rebut her claim of lack of follow up by showing the redundancy of the Grady system, i.e., that referrals and attendance at the multiple specialty clinics ensured a continuum of care. The trial court reconsidered and allowed the evidence to be admitted. The Court of Appeals determined that this ruling constituted reversible error, holding that "evidence of the missed . . . appointments was not probative of whether [Ms. Dawson] negligently cared for [Antonio] after the surgery was canceled in August." *Dawson*, supra at 721. We reverse.

Although, "[a]s a general rule in all negligence actions, evidence of similar acts or omissions is not admissible," *Gunthorpe v. Daniels*, 150 Ga. App. 113 (1) ( 257 SE2d 199) (1979), exceptions apply where the evidence " 'tends to prove some fact of the case on trial . . . or [to show] causation.' " Id. Moreover, the admissibility of evidence is favored in this state — "[i]f the relevancy of the offered evidence is in doubt, it should be admitted and sent to the jury under proper instructions." *McEachern v. McEachern*, 260 Ga. 320, 321 (394 SE2d 92) (1990) (quoting Agnor's Ga. Evid. (2d ed.), § 10-1, p. 223).

Plaintiff correctly argues that OCGA § 24-2-2 generally precludes the admission of evidence of antecedent negligence. But evidence of the missed appointments did not relate to plaintiff's conduct "in other transactions," as is contemplated by OCGA § 24-2-2. Instead, the evidence illustrated plaintiff's conduct with regard to the same transaction, the continuing health care of the child. As such, the evidence related to the facts of the case on trial and was probative of causation. *Gunthorpe*, supra. The trial court properly exercised its discretion in admitting the evidence. Compare *Leo v. Williams*, 207 Ga. App. 321, 322 (428 SE2d 108) (1993) (negligence of a party "committed at a prior time, on another occasion, in a different situation and with other parties" is generally inadmissible).

*Case No. S97G1956*

2. For the reasons which follow, we conclude that GMCF was not conducting a peer review function when it denied the request for Antonio's treatment and conveyed that information to Grady. Therefore, GMCF is not shielded from potential liability under OCGA § 31-7-132 (a).

Recognizing the need for confidentiality of peer review committee records, the General Assembly adopted OCGA § 31-7-132, enacted by Ga. L. 1975, p. 739, §§ 2, 3. The stated legislative intent,

as set forth at OCGA § 31-7-130, is to "provide protection for those individuals who are members of peer review groups which evaluate the quality and efficiency of professional health care providers and to protect the confidentiality of their records." That statement of legislative intent remains unchanged since its enactment. Thus, if an organization meets the definition of review organization *and is* conducting peer review within the meaning of the statute, a health care provider or member of a review organization is immune from criminal or civil liability, provided the health care provider is acting without malice. See 1988 Op. Atty. Gen. 15. Even assuming GMCF meets the broad definition of review organization under OCGA § 31-7-131 (3)[2] insofar as it performs peer review as defined by OCGA § 31-7-131 (1),[3] it will not be shielded from immunity under OCGA § 31-7-132 (a) for performing a function which does not amount to peer review.[4]

We now look to the role of GMCF in the context of the present case. In 1979, GMCF entered into an agreement with the Georgia Department of Medical Assistance to serve as the utilization and quality control review organization for the State of Georgia. In this context, a function of GMCF is to review certain proposed medical procedures for Medicaid recipients in order to assure that health care services are medically necessary and consistent with recognized standards of care. This is a requirement of the Social Security Act, 42 USC § 1396 et seq., to enable states to receive federal financial assistance to reimburse health care providers for the cost of specified services to Medicaid recipients. As pertains to the present case, GMCF was engaged in prospective utilization review by determining whether the proposed medical procedure would be paid for by Medi-

---

[2] OCGA § 31-7-131 (3) defines "Review Organization" in the context of the present case, as: "any panel, committee, or organization: (A) Which: (i) Is primarily composed of professional health care providers . . . and (B) Which engages in or utilizes peer reviews and gathers and reviews information relating to the care and treatment of patients for the purposes of: (i) Evaluating and improving the quality and efficiency of health care rendered . . . or (v) Evaluating the quality and efficiency of health care services rendered by a professional health care provider in connection with participation as a provider in or for an insurer, self-insurer, health maintenance organization, preferred provider organization, provider network, or other organization engaged in managed care."

[3] OCGA § 31-7-131 (1) defines "Peer Review" as: "the procedure by which professional health care providers evaluate the quality and efficiency of services ordered or performed by other professional health care providers, including practice analysis, inpatient hospital and extended care facility utilization review, medical audit, ambulatory care review, claims review, underwriting assistance, and the compliance of a hospital, nursing home, convalescent home, or other health care facility operated by a professional health care provider."

[4] The Court of Appeals failed to take into consideration the very broad definitional language of the peer review immunity statute, OCGA § 31-7-131, as amended by Ga. L. 1995, p. 612, § 3, and erroneously concluded that "peer review immunity established by OCGA § 31-7-132 applies only to individuals, not organizations." *Dawson,* supra at 718. See footnotes 2 and 3 herein.

caid and in communicating its decision to the provider.[5] Because the act of transmitting that information to the provider was purely administrative in nature, it is not peer review activity as defined by OCGA § 31-7-130.

Reading the statutory scheme as a whole, and giving deference to the stated intent of the legislature, we conclude that OCGA § 31-7-132 was not intended to provide an absolute shield of immunity protecting utilization review providers from potential liability for the consequences of their administrative acts. Thus, to the extent that liability is predicated on GMCF's alleged negligence in processing the medical precertification, it is not immune from liability under OCGA § 31-7-132 (a).[6]

*Judgment reversed in Case No. S98G1953; judgment affirmed in Case No. S98G1956. Benham, C. J., Fletcher, P. J., Hines, J., and Judge Jefferson L. Davis concur. Hunstein and Carley, JJ., concur in part and dissent in part. Sears, J., not participating.*

CARLEY, Justice, concurring in part and dissenting in part.

I fully concur in Division 2 of the majority opinion and in the affirmance of the judgment in Case No. S97G1956. However, with regard to Division 1, I believe that the Court of Appeals correctly found that the trial court abused its discretion in allowing evidence that the decedent's mother missed appointments in May and June of 1991. Speaking for the Court of Appeals, Judge Johnson very clearly points out that, "[b]ecause the evidence did not show [that the

---

[5] The process of utilization review is not a new phenomenon. Health insurers have always reviewed claims on the basis of medical necessity. Frankel, Medical Malpractice Law and Health Care Cost Containment: Lessons for Reformers from the Clash of Cultures, 103 Yale L.J. 1297 (1994). But traditionally, utilization review has occurred on a retrospective basis, i.e., the insurer reviewed claims for coverage after the treatment was provided to determine whether the care given was appropriate and medically necessary. Id. Under this system, regardless of whether the third-party payor ultimately approved or denied the claim for treatment, the patient was assured access to medically necessary care. Comment, *Wickline v. State*: The Emerging Liability of Third Party Health Care Payors, 24 San Diego L. Rev. 1023 (1987). Conversely, prospective utilization review requires physicians to obtain authorization from the third party payor prior to rendering certain services to a patient. Under this type of review, the third party payor applies the patient's characteristics to preestablished criteria for the particular diagnosis or treatment at issue. If the criteria are not met, the third party payor denies coverage. The ultimate effect of a prospective utilization review system is that if the third party payor denies coverage, the likely consequence is that the procedure will not be performed despite the medical necessity. See Note, Paying the Piper: Third Party Payor Liability for Medical Treatment Decisions, 25 Ga. L. Rev. 861, 907-911 (1991) (proposing that without liability for negligence in utilization review decisions, third party payors lack incentive to use reasonable care in the decision-making process).

[6] We note that OCGA § 31-7-132 has been applied and interpreted primarily in the context of discovery by providing immunity from disclosure of confidential information. See, e.g., *Emory Clinic v. Houston*, 258 Ga. 434 (369 SE2d 913) (1988); *Freeman v. Piedmont Hosp.*, 264 Ga. 343 (444 SE2d 796) (1994).

mother] had a 'fixed and uniform habit' of negligently caring for her son, evidence of the missed May and June 1991 appointments was not probative of whether she negligently cared for him after the surgery was canceled in August." *Dawson v. Fulton-DeKalb Hosp. Authority*, 227 Ga. App. 715, 721 (2) (b) (490 SE2d 142) (1997). Thus, I believe that the judgment of the Court of Appeals should be affirmed in its entirety.

I am authorized to state that Justice Hunstein joins in this opinion.

DECIDED NOVEMBER 23, 1998 —
RECONSIDERATION DENIED DECEMBER 18, 1998.

*Alston & Bird, Robert D. McCallum, Jr., James C. Grant, Candace N. Smith,* for appellant (case no. S97G1953).

*Carter & Ansley, Ben Kingree III, Mary K. Pickard, John L. McKinley,* for appellant (case no. S97G1956).

*A. LeRoy Toliver, James A. Shea, Jr., Joseph H. King, Jr.,* for appellees.