S92A0325. IN RE JANE DOE, a minor.
(418 SE2d 3)

CLARKE, Justice.

In this appeal from a final order in a declaratory judgment action, we face several difficult issues relating to medical decision-making for a terminally ill child. Jane Doe, a 13-year-old child, had experienced medical problems since birth. In May 1991, she was admitted to Scottish Rite Hospital following a mild choking episode. Initially her attending physicians expected she would recover. Over the next weeks, however, her condition degenerated and she became limp and unresponsive. The doctors described her condition as "stuporous" or varying between stupor and coma states, and noted her brain stem was shrinking or degenerating. She also suffered from various systemic illnesses. The doctors agreed that she suffered from a degenerative neurological disease, but none could make a certain diagnosis.

In late May her doctors placed Jane on a respirator. By mid-July

she had suffered recurrent infections and mental decline. At that time the doctors decided it was necessary to insert tracheostomy and gastronomy (breathing and feeding) tubes surgically. They discussed the possibility of a "Do Not Resuscitate" (DNR) order with her parents in case Jane suffered cardiac arrest during the procedure. Jane's mother, Susan Doe, agreed to a DNR order; her father, John Doe, did not. In August, Jane Doe's condition continued to decline. The doctors began to discuss whether deescalation of life support[1] and a DNR order might be appropriate. In early September, Susan Doe supported deescalation of life support and a DNR order. John Doe did not. At Susan Doe's request, Jane's medical situation was presented to Scottish Rite's Bioethics Committee. The Committee considered and evaluated Jane's condition and recommended the hospital back Jane's mother's desire to enter a DNR order and deescalate medical treatment.

The hospital filed a declaratory judgment action seeking guidance as to which of the parent's wishes it should follow. Although the hospital did not allege child abuse, or seek to cut off the parents' custodial rights, it alleged that continued aggressive treatment of the child constituted medical abuse. Shortly after the declaratory judgment action was filed, Susan Doe's position about a DNR order or deescalation of treatment began to waver. At the time of the hearing, she favored a DNR order, but not deescalation of treatment. After an evidentiary hearing, the trial judge entered an order enjoining the hospital from deescalating treatment or from enforcing a DNR order unless both parents agreed to such a course of treatment. The state filed this appeal.[2]

1. We find no merit to the state's contention that the hospital had no standing to bring this declaratory judgment action. We must construe the declaratory judgment statute liberally. *Athens v. Gerdine*, 202 Ga. 197 (42 SE2d 567) (1947). The statute is available in situations presenting an " 'actual controversy'. . . where interested parties are asserting adverse claims upon a state of facts wherein a legal judgment is sought that would control or direct future action." *Darnell v. Tate*, 206 Ga. 576, 580 (58 SE2d 160) (1950).

Here, the hospital was charged with a duty of care to an incompetent patient whose parents disagreed as to the appropriate course

---

[1] Deescalation is the discontinuation of medical measures, such as a ventilator. A DNR order means that extreme lifesaving procedures like countershock, chest compression and administration of medication to support heart rate and blood pressure will not be instituted in the event of cardiac or respiratory failure.

[2] Although Jane Doe died several weeks after the final order was entered in the declaratory judgment action below, this appeal is not moot because it is among those cases which are " 'capable of repetition yet evading review.' " *In re L. H. R.*, 253 Ga. 439 (321 SE2d 716) (1984) (quoting *Gerstein v. Pugh*, 420 U. S. 103 (95 SC 854, 43 LE2d 54) (1975)).

of medical treatment. Neither precedent nor statute provided a clear answer to the hospital's dilemma. Meanwhile, Jane Doe's condition continued to deteriorate and the likelihood that she would experience cardiac arrest increased daily. Without guidance as to which parent's instructions to follow, the hospital could not determine its legal obligation to its patient. On these facts, we conclude that the hospital adequately demonstrated a need for a legal judgment that would control its future action. A declaratory judgment action was appropriate.[3]

2. The state next contends the trial court erred in considering the hospital's petition because Jane Doe did not meet the criteria for withdrawal of life support established in *In re L. H. R.*, 253 Ga. 439 (321 SE2d 716) (1984). In *In re L. H. R.* we held that, in the absence of any conflicting state interest, a patient has a right to refuse medical treatment which right is not lost because of the youth or incompetence of the patient. We went on to say:

> We conclude that the right to refuse treatment or indeed to terminate treatment may be exercised by the parents or legal guardian of the infant after diagnosis that the infant is terminally ill with no hope of recovery and that the infant exists in a chronic vegetative state with no reasonable possibility of attaining cognitive function. The above diagnosis and prognosis must be made by the attending physician. Two physicians with no interest in the outcome of the case must concur in the diagnosis and prognosis. Although prior judicial approval is not required, the courts remain available in the event of disagreement between the parties, any case of suspected abuse, or other appropriate instances.

Id. at 446. In this case the state emphasizes Jane Doe's doctors could not diagnose with certainty the disease causing her neurological degeneration. The state also points out Jane Doe was not in a chronic vegetative state and death was not imminent.[4] Therefore, the state asserts, the hospital could not raise the issue of deescalation of medical treatment and the trial court should have dismissed the case.

---

[3] Contrary to the state's suggestion, this action does not fall within the exclusive jurisdiction of Juvenile Court. See OCGA § 15-11-5. The action did not seek to terminate the legal parent-child relationship or to wrest custody or control from Jane Doe's parents. Further, Jane Doe was not a "deprived child," because both parents actively sought the best available care and treatment for her.

[4] *Imminence* of death is not a criterion for deescalation of medical treatment under *In re L. H. R.* or under the current provisions of the Living Will statute. See OCGA § 31-31-2 (1992). See also *State of Ga. v. McAfee*, 259 Ga. 579 (385 SE2d 651) (1989). This court and the Georgia legislature have recognized, as have numerous other courts, scholars, and ethicists, that medical technology can extend the dying process almost indefinitely, so that technical death might not occur for many years if artificial support systems are continued.

(a) First, we reject the state's argument that the trial court should have dismissed this case because Jane Doe did not meet the criteria expressed in *In re L. H. R.* In *In re L. H. R.* we addressed a specific set of circumstances and decided that the parents and physicians caring for the infant could decide whether to proceed with deescalation of medical treatment without seeking judicial approval. The opinion set up guidelines to protect the rights of incompetent patients without involving the court in the medical decision-making process for every incompetent patient. The opinion did not preclude considering the propriety of deescalation under other circumstances. During the years since we considered *In re L. H. R.*, the legislature has enacted or amended several statutes governing the legal propriety of proxy health care decisions. See OCGA § 31-32-1 et seq. (Living Wills); OCGA § 31-36-1 et seq. (Durable Power of Attorney for Health Care); and OCGA § 31-39-1 et seq. (Cardiopulmonary Resuscitation). Also, other courts have recognized that incompetent patients have the right to refuse life sustaining treatment even though they are not in a chronic vegetative state.[5] Thus, while medical technology and society's understanding of death and dying continue to evolve and change, we cannot mandate a single, static formula for deciding when deescalation of medical treatment may be appropriate. Rather, we endorse the view that medical decision-making for incompetent patients is most often best left to the patient's family (or other designated proxy) and the medical community, see *In re L. H. R.*, supra; *In re Colyer*, 99 Wash2d 114 (660 P2d 738) (1983); *In re Browning*, 568 S2d 4 (Fla. 1990); *In re Storar*, 52 NY2d 363 (420 NE2d 64) (1981); and the courts remain available to decide controversial cases.

(b) We further reject the state's argument that Jane Doe's parents could not legally have decided to deescalate her medical treatment. The medical staff attending to Jane Doe agreed that she was in the final stages of some degenerative neurological disease, and that she vacillated between coma and stupor, responding only to deep pain stimulus. She required artificial means to support all her bodily func-

---

[5] See, e.g., *Superintendent of Belchertown State Sch. v. Saikewicz*, 373 Mass. 728 (370 NE2d 417) (1977) (chemotherapy treatment could be withheld from a profoundly retarded and disoriented man suffering from leukemia, where the chemotherapy would not cure his disease but merely prolong his suffering); *In re Spring*, 380 Mass. 629 (405 NE2d 115) (1980) (life-prolonging but noncurative hemodialysis treatment could be withheld from conscious but profoundly senile patient suffering from kidney disease); *In re Hier*, 18 Mass. App. 200 (464 NE2d 959) (1984) (surgery necessary for insertion of a stomach feeding tube could be withheld from incompetent person suffering from delusions and severe mental illness); *In re Conroy*, 98 N.J. 321 (486 A2d 1209) (1985) (right to terminate life-sustaining treatment could be exercised on behalf of an incompetent person with serious and permanent mental and physical impairments and a life expectancy less than one year); *Foody v. Manchester Mem. Hosp.*, 40 Conn. Sup. 127 (482 A2d 713) (1984) (life-sustaining treatment could be withheld from semicomatose patient described as "awake but unaware").

tions. The doctors agreed she lacked the ability for any cognitive function or interactive activity, and did not have any reasonable hope for her recovery. They also agreed there was no known medical treatment that could improve her condition or halt the neurological deterioration. It was apparent that the life support system was prolonging her death, rather than her life. There was no state interest in maintaining life support systems. Thus, we conclude that those legally responsible for Jane Doe could have refused treatment on her behalf without seeking prior judicial approval. *In re L. H. R., supra.*

(c) A corollary to the above statement is that Jane Doe's parents also could have consented to treatment on her behalf. See OCGA § 31-9-2 (persons authorized to consent to medical or surgical treatment). At the time of the hearing, both parents opposed deescalation of treatment. No party in this case argues that the parents' mutual decision to continue life support measures should have been overridden under the facts of this case.[6] This appeal does not present and we do not reach any issue regarding "medical abuse." Therefore, the trial court correctly enjoined the hospital from deescalating treatment over both parents' objection.[7]

3. The state next asserts the trial court erred in holding that a DNR order requires the concurrence of both parents of the child. The statute requires the agreement of both parents, if both parents are present and actively participating in the medical decision-making process for the child. OCGA § 31-39-1 allows "any parent"[8] to consent to a DNR order for a minor child. OCGA § 31-39-6 allows "any parent" to revoke consent to an order not to resuscitate. The result is as follows: One parent may consent. If there is no second parent, if the other parent is not present, or if the other parent simply prefers not to participate in the decision, the consent of one parent to a DNR

---

[6] The law recognizes that parents " 'possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions. More importantly, . . . natural bonds of affection, lead parents to act in the best interests of their children.' " *In re L. H. R.*, 253 Ga., supra at 445 (quoting *Parham v. J. R.*, 442 U. S. 584, 602 (99 SC 2493, 61 LE2d 101) (1979). Therefore, the law presumes that the parents are the appropriate parties to make their children's medical decisions. For this reason in *In re L. H. R.*, supra, we held that, under certain circumstances, the parents of an incompetent child may exercise the child's right to refuse medical treatment without prior judicial approval. We have never held, however, that parents have an absolute right to make medical decisions for their children. See, e.g., *Jefferson v. Griffin Spalding County Hosp. Auth.*, 247 Ga. 86 (274 SE2d 457) (1981); *In the Interest of C. R.*, 160 Ga. App. 873 (288 SE2d 589) (1982). The United States Supreme Court similarly does not recognize an absolute right of a parent to make medical decisions for a child. See *Parham v. J. R.*, supra.

[7] This appeal does not present any issue regarding what should have been done if Jane Doe's parents had disagreed at trial or thereafter about the propriety of deescalating treatment.

[8] Note that the statute defines "parent" as a parent who has custody of a minor. OCGA § 31-39-2 (10).

order is legally sufficient under the statute. However, if there is a second custodial parent who disagrees with the decision to forego cardiopulmonary resuscitation, the second parent may revoke consent under the terms of OCGA § 31-39-6 (b). We reject the argument that only the parent who has given consent may effectively revoke consent. Where two parents have legal custody of a child, each parent shares equal decision-making responsibility for that child. If consent to a DNR order is revoked under the provision of OCGA § 31-39-6 (b), the hospital must follow the statutory presumption that every patient is presumed to consent to resuscitation.[9] See OCGA § 31-39-3 (a). Thus, because the father revoked consent, the trial court correctly determined the hospital could not enter a DNR order.

*Judgment affirmed. All the Justices concur. Sears-Collins, J., disqualified.*

HUNT, Justice, concurring.

I write in response to the state's motion for reconsideration.

The state urges that we further delineate the limits of a hospital's standing in cases like this one. In particular, the state asks us to hold, as did the trial court, that a hospital would not have standing to advocate an alternative course of treatment where the parents or legal guardians agree about the course of treatment for their child.[10] We make no such holding, and our opinion should not be read to confer standing for a hospital under circumstances other than those presented here; that is, where the parents *disagree* about the course of such medical treatment. This is not to imply that, when a case presents the issue, we would interpret a hospital's standing either more broadly or more narrowly than we have done here. Compare *Jefferson v. Griffin Spalding County Hosp. Auth.*, 247 Ga. 86 (274 SE2d 457) (1981).

DECIDED JULY 6, 1992 —
RECONSIDERATION DENIED JULY 30, 1992.

---

[9] The statutory presumption governs only consent to emergency cardiopulmonary resuscitation. No statutory or other presumption governs the issue of consent to other, non-emergency medical procedures.

[10] In its motion for rehearing, the state says we should address this argument because the trial court *ordered* this appeal for that purpose — to provide the opportunity for this court to set the limits of a hospital's standing. It is beside the point, but I note that in *State of Ga. v. McAfee*, 259 Ga. 579 (385 SE2d 651) (1989), a case involving similar issues of medical treatment, the trial court *ordered* an appeal. That a trial court has no such authority is beyond any legitimate challenge. It may, and sometimes should, suggest, request, and even encourage an appeal, but surely it cannot compel a party to do so. It cannot confer jurisdiction upon an appellate court, where jurisdiction would not otherwise lie.

*Michael J. Bowers, Attorney General, William C. Joy, Senior Assistant Attorney General, William M. Droze, Assistant Attorney General,* for appellant.

*John E. Talmadge, Finch, McCranie, Brown & Thrash, Charles E. McCranie, Alston & Bird, Susan B. Devitt, Richard A. Snow, Long, Aldridge & Norman, Paula R. Miller,* for appellee.