## A05A0576. HARRIS v. GRIFFIN.
(612 SE2d 7)

BARNES, Judge.

Vivian Harris appeals the trial court's grant of summary judgment to Alvin Griffin, M.D., arguing that the trial court erred in concluding that she had no doctor-patient relationship with him. For the reasons that follow, we reverse the trial court's ruling.

Harris sued Griffin, two other doctors, and a hospital, contending that they committed medical malpractice when they failed to diagnose her herniated thoracic disk, which led to permanent neurological motor deficits. Harris testified that she began having terrible back pain in November 1999. On December 6, 1999, she saw one of the defendants, James D. Stillerman, M.D., complaining of numbness and a pins-and-needles sensation in her legs. He sent her for an x-ray on January 4, 2000, and she returned to him the next day, saying her back pain had worsened. Stillerman, a family practitioner, sent her for physical therapy, which she began a few days later. She called Stillerman on January 10, 2000, and reported that physical therapy was helping, but that her therapist told her to report to the doctor that her "gait is like someone who is drunk or someone who has had a stroke." Harris explained that she just could not keep her balance, despite using a cane.

On January 17, 2000, Harris called Stillerman to complain again of severe back pain. Stillerman referred Harris to Robin Minks, D.O.,

---

[7] (Citation omitted.) *Woody's Steaks*, supra at 818 (1).

for treatment, and she went to Minks's office the next day, but Minks was not there. The day after that, Harris finally saw Minks, who told her she was "just having a little muscle spasm" and gave her an injection in her back for the pain. She testified that after the shot, her condition deteriorated rapidly, with increased numbness in her legs and more difficulty standing and walking.

On February 4, 2000, Harris fell at her home because of the numbness in her legs. She called Minks, who told her he would meet her at the hospital emergency room. Harris arrived at the hospital around 4:10 p.m., signed in, and was placed in a room to wait for Minks, whom hospital staff told her was on-site and would see her soon. At 6:45 p.m., Harris left the hospital against medical advice, without seeing anyone, because she "wasn't getting taken care of" and she was cold and in pain.

Stillerman called Harris the following Monday, February 7, 2000, to ask why she had left the hospital. She explained to him what had happened, and asked him to refer her to someone else. She said he told her she had two options: to return to the hospital or to come see him that Thursday, February 10, 2000, but would not give her a referral, which she needed for her insurance. Harris went to Stillerman's office on February 10, and her friend had to get a wheelchair from the doctor's office because Harris could not walk from her car. Harris testified that her blood pressure was 250/150 when Stillerman checked it, that he told her nothing was wrong with her, and that her problem was mostly in her mind, and he recommended she return to another treating doctor, presumably a psychologist or psychiatrist. Harris said she had seen that other doctor three days earlier, and the doctor told her to return to Stillerman but take a witness with her.

After she returned home from Stillerman's office, Harris said she called Dr. Griffin, a family practitioner who had treated her mother, and saw him the next day, February 11, 2000. Harris testified that although she saw Griffin only to get a referral to a specialist, she filled out new patient forms, and Griffin took her history, examined her thoroughly, then called several places to find a specialist who could see her quickly. He secured two appointments for her, one at a neurologist on February 23, 2000, and one at Emory on March 6, 2000. Harris said Griffin probably told her she could go to a hospital emergency room too. She overheard him tell someone on the telephone when he was trying to get her referral that he thought she might have a mass on her spine, and said several people had questioned why he did not send her to the hospital immediately if he suspected that.

Harris also testified that she thought Griffin saved her life, because no one else would give her a referral, and that he felt she had

been badly mistreated, was very kind and understanding, and ordered a wheelchair for her and had it delivered the same day he saw her. She continued to see Griffin afterward for checkups, and called to let him know her progress. When she told him later that she was scared about her impending surgery, he told her to say the 23rd Psalm and that it would be all right.

Harris testified that, between her visit to Griffin and her neurologist appointment, she could not urinate, was constipated, could not lift her swollen legs or feet, needed help to bathe, and had to use a wheelchair to get around. On February 23, 2000, she saw the neurologist to whom Griffin referred her, and she ordered an MRI the next day. After the MRI, she returned home and the neurologist called to tell her to return to the hospital immediately. She did so, and was immediately admitted. Six days later, after multiple tests, she had a discectomy at T9-10 for a large herniation, after which she was transferred to Shephard Spinal Center for in-patient rehabilitation. She remained at Shephard until March 31, 2000, then underwent three months of outpatient physical therapy.

Harris filed her medical malpractice complaint against Stillerman, Minks, Newton Health System, Inc., and Griffin on January 4, 2002. In the OCGA § 9-11-9.1 affidavit, Harris's expert opined that Dr. Griffin violated the standard of care by failing to send Harris immediately to "a point of service where the appropriate diagnosis can be made and appropriate treatment can be arranged." The 12-day delay in treatment between Harris's visit with Griffin and the neurologist's visit to which Griffin referred her, the expert said, "proximately caused Ms. Vivian Harris to have a substantial delay in her diagnosis, which resulted in her being subjected to extreme physical and mental pain, suffering, and disability, which continues to some degree today and is projected to continue into the future."

The trial court granted summary judgment to the hospital on both Harris's agency theory regarding Minks and her malpractice claim. Griffin moved for summary judgment also, contending only that he could not have committed malpractice because he and Harris had no doctor-patient relationship. On that basis, the trial court granted Griffin's motion, finding that Harris admitted in her deposition that she only went to Griffin on February 11, 2000, to obtain a referral, and that therefore no patient-physician relationship existed on that day despite Harris's later visits to Griffin.

On appeal we review the trial court's grant of summary judgment de novo to determine whether the evidence, viewed in the light most favorable to the nonmoving party, demonstrates a genuine issue of material fact. Summary judgment is proper only when no issue of material fact exists and the moving party is entitled to judgment as a matter of law. *Preferred Real Estate Equities v. Housing Systems,*

248 Ga. App. 745 (548 SE2d 646) (2001). Further, when ruling on a motion for summary judgment, a court must give the opposing party the benefit of all reasonable doubt, and the evidence and all inferences and conclusions therefrom must be construed most favorably toward the party opposing the motion. *Moore v. Goldome Credit Corp.*, 187 Ga. App. 594, 595-596 (370 SE2d 843) (1988). On motions for summary judgment, however, courts cannot resolve the facts or reconcile the issues. *Fletcher v. Amax, Inc.*, 160 Ga. App. 692, 695 (288 SE2d 49) (1981). When reviewing the grant or denial of a motion for summary judgment, this court conducts a de novo review of the law and the evidence. *Desai v. Silver Dollar City*, 229 Ga. App. 160, 163 (1) (493 SE2d 540) (1997).

In Georgia, a doctor is not liable for malpractice absent a physician-patient relationship. "[D]octor-patient privity is essential because it is this relation which . . . is a result of a consensual transaction that establishes the legal duty to conform to a standard of conduct." (Citation and punctuation omitted.) *Bradley Center v. Wessner*, 250 Ga. 199, 201 (296 SE2d 693) (1982). The relationship is consensual if the patient knowingly seeks the physician's help and the physician knowingly accepts her as a patient. *Anderson v. Houser*, 240 Ga. App. 613, 615 (1) (523 SE2d 342) (1999).

Griffin argues that Harris was not his patient "for treatment purposes," but only saw him to get a referral, nothing more. He gave her what she asked for, a referral, and although he later saw her as a patient, he contends that she was not his patient the day he first saw her. Harris argues that, on the day Griffin first saw her, she filled in Griffin's new patient form and consent to treatment. Then he examined her, took her medical history, diagnosed her, and billed Medicare for the visit.[1] His diagnosis was "acute onset of lower extremity weakness and numbness. Rule out entrapment versus tumor." Griffin made a pain clinic referral and specifically instructed the neurologist to conduct a nerve conduction study and an EMG. Harris's subsequent treating physicians sent reports back to Griffin, and he and Harris called each other "from time to time" to update her progress.

The cases Griffin cites for the proposition that a doctor can have a limited relationship with his patient involve very different fact patterns. For example, a cardiologist's consultative examination for the sole purpose of rendering a medical opinion to the Department of Human Resources concerning a disabled man's ability to work did not establish a doctor-patient relationship in *Peace v. Weisman*, 186 Ga.

---

[1] The Medicare bill itself is not included in the record, nor is Griffin's deposition.

App. 697, 698 (1) (368 SE2d 319) (1988). Nor did a doctor's examination of a man at the direction of his employer's Workers' Compensation carrier for a return-to-work certificate. *Payne v. Sherrer*, 217 Ga. App. 761, 763 (1) (458 SE2d 916) (1995). Finally, a doctor's acceptance of a telephone call from a patient he treated for a previous, unrelated matter established no doctor-patient relationship because the doctor did not undertake "to render his medical expertise available to her." *Clanton v. Von Haam*, 177 Ga. App. 694, 697 (2) (340 SE2d 627) (1986).

> The established test in Georgia for determining the initial creation of a physician-patient relationship is well within the comprehension of the average layman, in that it more nearly involves the application of non-expert concepts of a contractual nature rather than any expert medical principles. The physician-patient relationship is a consensual one wherein the patient knowingly seeks the assistance of the physician and the physician knowingly accepts him as a patient.

(Citation and punctuation omitted.) Id. at 696 (1).

In this case, the evidence of record does not support the trial court's order. In so ruling, we make no determination as to whether Dr. Griffin was negligent in his treatment of Harris, only that he is not entitled to summary judgment based on his argument that he had no doctor-patient relationship with Harris.

*Judgment reversed. Ruffin, C. J., and Blackburn, P. J., concur. Johnson, P. J., not participating.*

DECIDED FEBRUARY 21, 2005 —
RECONSIDERATION DENIED MARCH 16, 2005.

*Edmond & Jones, Roderick E. Edmond, Craig T. Jones*, for appellant.

*Forrester & Brim, James E. Brim III, Hall, Booth, Smith & Slover, Heather C. McGrotty, Huff, Powell & Bailey, Michael S. Bailey, Sherard K. Dixon*, for appellee.