A07A2222, A07A2223. USSERY et al. v. CHILDREN'S HEALTHCARE OF ATLANTA, INC. et al.; and vice versa. A07A2224. JOSE et al. v. USSERY et al.
(656 SE2d 882)

BLACKBURN, Presiding Judge.

William Ussery and his former wife, on behalf of the estate of their deceased minor daughter Ella Ussery ("Ella") and as Ella's parents (collectively "plaintiffs"), filed suit in the State Court of Fulton County, on March 24, 2000, against Children's Healthcare of Atlanta, Inc. (f/k/a Scottish Rite Children's Medical Center) ("Scottish Rite"), Dr. James Jose, and his employer, Neonatalogy Associates, P.C., and several of the physicians who had treated Ella, alleging professional and nonprofessional negligence, that the defendants had failed to meet the applicable standard of care in varying particulars, and that the defendants were guilty of medical malpractice which caused Ella's injury and death.

On June 4, 2001, plaintiffs filed their first amendment to their complaint, and added Pediatric Emergency Associates (the employer of Dr. Mills and Dr. Cortes) as a defendant. They added allegations

that Dr. Mills and Dr. Cortes were operating within the scope of their employment at all relevant times; that Dr. Jose ordered the withdrawal of nutrition and hydration, which led to Ella's death; and they removed two paragraphs from the original complaint, which had stated that as a result of her brain damage, Ella was reduced to a persistent vegetative state, and that as a result of that condition, the decision was made to withdraw nutrition and hydration.

On October 24, 2001, plaintiffs filed their second amendment to their complaint. They added *Plaintiffs' Statement of Facts Disputing Dr. Jose's Statement of Facts.* They also added several allegations of specific instances of malpractice by Dr. Jose in the case, which issue is not before us on this appeal, and is still pending in the trial court. They alleged that, as Dr. Jose's employer, Neonatology Associates, P.C., is responsible for his actions in this case. They also alleged that Dr. Jose negligently or intentionally caused Ella's death because no factual or legal basis existed warranting the withdrawal of nutrition and hydration, and because Dr. Jose misrepresented to Dr. White that nutrition and hydration could not be restarted. We do not address plaintiff's initial or subsequent negligence allegations in this appeal, because, other than a limited question involving Dr. Jose, addressed in Case No. A07A2224. Those issues are not before us and are still pending in the trial court. Because these three appeals are related, we consolidate them for review.

In Case No. A07A2222, we address plaintiffs' intentional tort allegations of unlawful withdrawal of life support raised for the first time in their second amendment, filed some 17 months after the original complaint, which is the only matter raised by plaintiffs on their appeal. Plaintiffs argue that the trial court erred in ruling that Scottish Rite complied with the requirements under Georgia law for withdrawal of life support and in ruling that plaintiffs fully consented to the withdrawal. The question before this Court in this appeal is limited to whether or not the trial court erred in granting summary judgment to Scottish Rite and Dr. Jose, holding that these defendants did not intentionally injure or cause the death of Ella. While certain acts may or may not have constituted medical malpractice, there must be evidence of the intentional nature of defendants' acts to support plaintiffs' contentions. We affirm the trial court's grant of defendants', and denial of plaintiffs', motions for summary judgment on the intentional tort claims in Case No. A07A2222, for the reasons hereinafter outlined.

In Case No. A07A2223, Scottish Rite appeals the trial court's ruling that plaintiff's intentional tort claim is not barred by the statute of limitation and Dr. Jose and Neonatalogy Associates, P.C. appeal the same issue in Case No. A07A2224. Given the fact that we affirm the trial court's grant of summary judgment to defendants and

denial of summary judgment to plaintiffs on the intentional tort claim, we need not address this issue.

Also in Case No. A07A2223, Scottish Rite appeals the trial court's ruling that hospital incident reporting and nonparty patient records are not protected from discovery. For reasons hereafter outlined, we reverse the trial court's ruling ordering the production of the incident reporting documents; however, because it requires notice to the patient and an opportunity to object, and has other safeguards, we affirm the order requiring the production of nonparty patient records.

In Case No. A07A2224, Dr. Jose and his employer, Neonatalogy Associates, P.C., also appeal the trial court's denial of their motion for summary judgment, arguing that the court erred in ruling that a question of fact remained as to whether or not the physician-patient relationship ended when Ella transferred to another ICU. They argue that there was no duty of care owed her by Dr. Jose as the relationship had ended upon Ella's transfer. We affirm the trial court's denial of defendants' motions for summary judgment in Case No. A07A2224 for the reasons hereinafter outlined.

The question in Case No. A07A2222 is whether Scottish Rite's and Dr. Jose's decision to withdraw Ella's life support, in light of Ella's condition and her parents' consent, constituted an intentional tort under Georgia law. We hold that under these circumstances it did not, particularly considering the relevant case law and the evidence as to the actions taken by Scottish Rite and Dr. Jose (at the time of decision) in obtaining additional medical concurring opinions that Ella's brain damage was irreversible and that the chances were poor that she would ever regain cognitive functions (with which conclusions plaintiffs' own later-hired expert concurred). Indeed, plaintiffs' claim is an improper attempt to transform a possible malpractice claim into an intentional tort.

The key issue in Case No. A07A2223 is whether Scottish Rite's incident reporting records, which were designed to allow the hospital's department of quality/performance improvement to make evaluations that would improve patient care, are covered by the peer review privilege and whether nonparty patient records are discoverable. Because the very purpose of the peer review privilege is to protect from discovery hospital efforts at self-evaluation for improving patient care, we reverse the trial court's ruling ordering the production of these documents; however, we affirm the order requiring the production of nonparty patient records where the patients are given notice and opportunity to object.

Finally, the relevant inquiry in Case No. A07A2224 is whether Dr. Jose continued his physician-patient relationship with Ella when she was moved from one ICU to another. Because some evidence showed that the doctor in his notes and in his conversations with

Ella's mother indicated that he would continue to act as the child's physician, we affirm the denial of Dr. Jose's motion for summary judgment on this question.

Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. OCGA § 9-11-56 (c); *Britt v. Kelly & Picerne, Inc.*[1] "On appeal from the grant or denial of a motion for summary judgment, we review the evidence de novo, and all reasonable conclusions and inferences drawn from the evidence are construed in the light most favorable to the nonmovant." *McCaskill v. Carillo*.[2]

So construed, the evidence shows that 34-month-old Ella was admitted to Scottish Rite hospital on March 15, 1998, for laryngotracheal reconstructive surgery to correct a narrowed airway condition below her vocal cords known as a subglottic stenosis. Ella had been diagnosed with this condition shortly after being born 12 weeks premature in 1995, and had relied on a tracheostomy[3] to assist her breathing since that time. The surgery was successfully performed on March 16, after which Ella was moved to Section A of Scottish Rite's intensive care unit ("ICU-A") and placed under the care of intensive care physician Dr. Jose. On March 27, Ella had been moved to ICU-C and had been recovering there for several days when she began to suffer a series of periodic throat spasms, which would cause her to stop breathing for a few seconds. Some time after 9:00 p.m. that day, Ella suffered another throat spasm, while also vomiting food she had eaten earlier, and began choking. With her airway completely blocked, she soon stopped breathing and lost consciousness. Scottish Rite staff immediately called a "Code Blue" to alert physicians that a patient was in cardiac or respiratory arrest. An emergency department physician arrived within a couple of minutes but could not successfully intubate Ella to restore her breathing. By the time another physician arrived and successfully intubated her, Ella had been substantially deprived of oxygen for at least 20 minutes.

As a result of this oxygen deprivation, Ella had lapsed into a coma and was feared to have suffered a significant irreversible brain injury known as hypoxic encephalopathy. Over the next couple of days, Dr. Jose, a physician in the intensive care unit at Scottish Rite who had assisted with Ella's care in the ICU for a few days immediately following her surgery, met with plaintiffs to update them on Ella's condition and to inform them that Ella would have to be evaluated further before any prognosis could be offered. At that time,

---

[1] *Britt v. Kelly & Picerne, Inc.*, 258 Ga. App. 843 (575 SE2d 732) (2002).

[2] *McCaskill v. Carillo*, 263 Ga. App. 890 (589 SE2d 582) (2003).

[3] A tracheostomy is a small tube placed in a patient's neck to create an artificial airway.

Dr. Jose also informed plaintiffs that there were grave concerns as to whether Ella would ever regain consciousness.

On April 1, 1998, Dr. Jose and a pediatric neurologist met with plaintiffs to inform them that physical exams, EEGs, and CT scan tests indicated that Ella had suffered a severe and irreversible brain injury and that the chances were very poor that she would ever regain cognitive functions. Dr. Jose also discussed with plaintiffs the option of withdrawing all medical life support and allowing Ella to die. Both plaintiffs agreed that they did not want Ella kept alive if she could never laugh or play again. Consequently, at the conclusion of the meeting, both plaintiffs expressed their desire to withdraw life support and signed a consent form provided by Scottish Rite, in which they indicated their consent to withdraw "[l]ife sustaining procedures or interventions that INCLUDE the withdrawal of hydration and nutrition." (Emphasis in original.) The consent form further indicated that Dr. Jose and two other independent physicians, one of whom worked for Dr. Jose's employer Neonatal Associates, agreed that based on Ella's condition, "the withdrawal of life sustaining treatment is the best medical course of treatment for the patient."

Later that same day, physicians removed Ella's ventilator, at which point, notwithstanding her brain injury, she began breathing on her own. Because of her unchanged prognosis, Ella's intravenous hydration and nutrition were withdrawn the next day. After a few days, plaintiffs considered the possibility of re-instituting hydration and nutrition; however, neither ever revoked their consent to the withdrawal of life support or requested that the hospital re-institute any life-sustaining treatment. Following the withdrawal of life support, the hospital continued to monitor Ella's brain activity but did not observe any significant changes in her condition. On April 15, 1998, Ella died without ever having regained consciousness.

On March 24, 2000, Ussery filed the initial complaint,[4] which was amended first on June 4, 2001, and again on October 24, 2001, and defendants responded.

During discovery, Scottish Rite moved for protective orders to shield hospital incident reporting forms and nonparty patient records from discovery but was ordered by the trial court to produce the documents, which result it appeals in Case No. A07A2223. Dr. Jose sought summary judgment on the ground that he did not owe Ella a duty of care at the time she was initially injured and, in a separate motion, on the ground that plaintiffs' intentional tort claim was barred by the statute of limitation. The trial court denied both motions, which he appeals in Case No. A07A2224.

---

[4] Ella's mother, who is Ussery's former wife, was later added to the complaint as a plaintiff.

Scottish Rite also sought summary judgment on the ground that plaintiffs' intentional tort claim was time-barred. The court denied summary judgment on this ground, which Scottish Rite appeals in Case No. A07A2223. Scottish Rite and Dr. Jose further sought summary judgment on the ground that the withdrawal of Ella's life support did not constitute an intentional tort. Plaintiffs, in turn, moved for summary judgment, arguing that the withdrawal of life support was improper and thus constituted an intentional tort as a matter of law. After a hearing, the trial court granted both Scottish Rite's and Dr. Jose's motions on this issue and denied plaintiffs' motion. Plaintiffs appeal these rulings in Case No. A07A2222.

### Case No. A07A2222

1. In Case No. A07A2222, plaintiffs contend that the trial court erred in denying their motion for summary judgment and granting summary judgment to Scottish Rite and Dr. Jose on the claim that the withdrawal of Ella's life support constituted an intentional tort. Under Georgia law, an intentional tort arises in a medical context when a medical professional makes unauthorized contact or takes unauthorized action with regard to a patient's treatment. *King v. Dodge County Hosp. Auth.*[5] See *Velez v. Bethune*.[6] In cases involving the withdrawal of a child's life support, even otherwise legitimate treatment decisions may constitute an intentional tort if parental consent is lacking. See *Velez*, supra, 219 Ga. App. at 680 (1). Here, plaintiffs argue that the withdrawal of Ella's life support was unlawful because (a) Ella's condition was never diagnosed as terminal; (b) the physicians who made the decision to withdraw life-sustaining treatment were not disinterested; and (c) proper consent for the withdrawal was not obtained from plaintiffs. In essence, plaintiffs' claim addresses the propriety of Dr. Jose's and Scottish Rite's decision. While such a claim may serve as the basis for a malpractice action, we do not agree that it constitutes an intentional tort.

(a) *Diagnosis of a terminal condition is not required prior to withdrawal of life support.* Contrary to plaintiffs' argument, there is no mandate under Georgia law requiring that a patient be diagnosed with a terminal condition prior to the removal of life support. The criteria in Georgia for the withdrawal of a minor's life support were initially discussed in *In re L. H. R.*[7] In that case, which involved a four-month-old infant in an irreversible chronic vegetative state, our

---

[5] *King v. Dodge County Hosp. Auth.*, 274 Ga. App. 44, 45 (616 SE2d 835) (2005).

[6] *Velez v. Bethune*, 219 Ga. App. 679, 680 (1) (466 SE2d 627) (1995).

[7] *In re L. H. R.*, 253 Ga. 439 (321 SE2d 716) (1984).

Supreme Court held that a competent adult patient has the right to refuse medical treatment in the absence of a conflicting state interest and that "this right rises to the level of a constitutional right which is not lost because of the incompetence or youth of the patient." Id. at 446. See *Kirby v. Spivey*.[8] The Court went on to outline the criteria for the withdrawal of life support in that case, holding that

> the right to refuse treatment or indeed to terminate treatment may be exercised by the parents or legal guardian of the infant after diagnosis that the infant is terminally ill with no hope of recovery and that the infant exists in a chronic vegetative state with no reasonable possibility of attaining cognitive function. The above diagnosis and prognosis must be made by the attending physician. Two physicians with no interest in the outcome of the case must concur in the diagnosis and prognosis. Although prior judicial approval is not required, the courts remain available in the event of disagreement between the parties, any case of suspected abuse, or other appropriate instances.

*In re L. H. R.*, supra, 253 Ga. at 446. The Court further acknowledged that advances in medical science were rapidly expanding the limits of life-sustaining treatment and thus numerous questions regarding the difficult decision to withdraw life support were constantly arising. Id. at 445. The Court therefore limited its holding to the circumstances before it. Id.

Eight years later, in *In re Jane Doe*,[9] the Supreme Court of Georgia reiterated that *In re L. H. R.* addressed only its own specific circumstances. The Court then ruled that the parents and the physicians treating 13-year-old Jane Doe could have decided whether to withdraw life support without seeking judicial approval and further held that "[t]he opinion did not preclude considering the propriety of deescalation under other circumstances." Id. The Court reasoned that

> while medical technology and society's understanding of death and dying continue to evolve and change, *we cannot mandate a single, static formula for deciding when deescalation of medical treatment may be appropriate.* Rather, we endorse the view that medical decision-making for incompetent patients is most often best left to the patient's family

---

[8] *Kirby v. Spivey*, 167 Ga. App. 751, 752-753 (2) (307 SE2d 538) (1983).

[9] *In re Jane Doe*, 262 Ga. 389, 392 (2) (a) (418 SE2d 3) (1992).

(or other designated proxy) and the medical community, and the courts remain available to decide controversial cases.

(Citations omitted; emphasis supplied.) Id. Employing this reasoning, the Court rejected the State's argument that withdrawal of life support would have been improper because Jane Doe was not in a chronic vegetative state, and because her death was not imminent. Id. at 393 (2) (b). In doing so, the Court noted that *In re L. H. R.* did not establish imminence of death as a criterion for deescalation of medical treatment. Id. at 391 (2), n. 4. See also *State of Ga. v. McAfee*[10] (holding that a quadriplegic, who depended upon a ventilator to breathe but was not terminal or without cognitive abilities, had the right to discontinue life support). The Court concluded that because the physicians agreed that Jane Doe vacillated between coma and stupor, lacked the ability for any cognitive function, and did not have any reasonable hope for recovery, her parents could have chosen to withdraw life support without court intervention. *In re Jane Doe,* supra, 262 Ga. at 392-393 (2) (b).

With the above precedent in mind, we hold that Ella's medical condition legally justified the decision to withdraw her life support. Here, as a result of the throat spasms and choking incident she had suffered, Ella had been substantially deprived of oxygen for 20 minutes and had lapsed into a coma. Based on neurological exams, EEGs, and CT scans, the physicians who evaluated Ella, as well as plaintiffs' medical expert, all agreed that she more than likely had suffered a severe and irreversible brain injury, and that the chances were very poor that she would ever regain consciousness or cognitive functions. In addition, none of the physicians who examined Ella after life support had been removed noted any sort of progress or improvement in her cognitive condition.

Contrary to plaintiffs' claims, the medications being administered to Ella were provided to control her seizures and alleviate plaintiffs' concerns that she might feel pain and not because the physicians believed she was able to actually feel pain.

Also contrary to plaintiffs' allegations, Ella's arm movements, which were allegedly witnessed by her grandparents, were not indicative of improvement in her cognitive state but rather were involuntary spasms commonly exhibited by patients in Ella's condition.

Given the specific medical circumstances at issue here, the decision to withdraw life support was not an intentional tort under Georgia law regardless of whether or not Ella's condition could have

---

[10] *State of Ga. v. McAfee,* 259 Ga. 579, 580-581 (1) (385 SE2d 651) (1989).

been characterized as terminal[11] or whether her death was imminent. See *In re Jane Doe*, supra, 262 Ga. at 393 (2) (b); *McAfee*, supra, 259 Ga. at 581 (1); *In re L. H. R.*, supra, 253 Ga. at 446. Furthermore and also contrary to plaintiffs' contentions, Georgia case law has not established immutable timetables that must be followed when contemplating the decision of whether to withdraw life support and in determining whether that decision constitutes an intentional tort.[12] Indeed, if this Court were to do so here, we would be enacting via judicial fiat the very static formula proscribed by our Supreme Court. See *In re Jane Doe*, supra, 262 Ga. at 392 (2) (a).

At most, plaintiffs' claims address the propriety of the decision to remove Ella's life support; however, while such claims may form the basis for a malpractice action, they do not constitute an intentional tort. For example, in *Morton v. Wellstar Health System*,[13] the executrix of her mother's estate sought punitive damages and attorney fees, alleging an intentional tort in Wellstar's feeding of scrambled eggs to her mother, consistent with the physician's orders and the patient's consent. The executrix alleged her mother's death resulted from professional and ordinary negligence of the hospital. The trial court granted Wellstar's motion for summary judgment and denied the counter-motion of the executrix, finding that the battery claim did not establish conduct falling outside the scope of the consent. This Court held that a plaintiff may not "premise a claim for medical battery on the assertion that he did not consent to the negligent performance of the medical procedure otherwise covered by a valid consent, because such a role would transform every medical malpractice claim into a battery claim." (Punctuation omitted.) Id.

(b) *Withdrawal of life support was not rendered improper based on the employment status of the two physicians who participated with Dr. Jose in that decision.* Plaintiffs also contend that the decision to withdraw Ella's life support amounted to an intentional tort because the two physicians with whom Dr. Jose consulted were not disinterested as allegedly required by *In re L. H. R.*, supra, 253 Ga. at 446. This contention is without merit.

As discussed in Division 1 (a), supra, the holding of *In re L. H. R.* has been limited to the specific circumstances of that case and did not

---

[11] We note that while disagreeing that Ella could have been diagnosed as having a terminal condition, plaintiffs' expert nevertheless conceded that even if life support measures had been maintained, the injuries Ella suffered as a result of her hypoxic encephalopathy would have ultimately led to her death.

[12] As previously stated, questions as to whether the decision to remove Ella's life support was negligently made were not addressed in the parties' motions for summary judgment and therefore are not the subject of this appeal.

[13] *Morton v. Wellstar Health System*, 288 Ga. App. 301, 302-303 (1) (653 SE2d 756) (2007).

"mandate a single, static formula for deciding when deescalation of medical treatment may be appropriate." *In re Jane Doe*, supra, 262 Ga. at 392 (2) (a). Indeed, plaintiffs concede that no Georgia case law concerning these types of decisions mandates the number of physicians that must be involved or their level of interest. Accordingly, Georgia case law does not establish a requirement for the number of physicians involved in such decisions.

Furthermore, no statute mandates the number of physicians required to participate in decisions to withdraw a minor's life support nor does any statute establish rules stating that a physician's ability to participate in such a decision is dependent upon their employment status.[14] Moreover, even if the number of physicians that should be involved in a decision to withdraw life support suggested in *In re L. H. R.* were construed as a requirement, Dr. Jose fully complied by obtaining the participation of two nontreating physicians in the decision. Thus, the consultation in the decision to withdraw Ella's life support by the two other physicians listed on the consent form by Dr. Jose was not unlawful.

(c) *Both parents consented to the withdrawal of Ella's life support.* Plaintiffs further contend that the withdrawal of Ella's life support was an intentional tort because Dr. Jose and Scottish Rite did not properly obtain their consent as Ella's parents, and because they later revoked that consent. We disagree.

As previously stated, an intentional tort arises in the medical context when a medical professional makes unauthorized contact with a patient during treatment. *King*, supra, 274 Ga. App. at 45. However, under Georgia law, consent to authorize medical treatment bars an intentional tort claim based on that treatment. See id.; *Williams v. Lemon*.[15] Here, Dr. Jose and a pediatric neurologist met with Ella's parents to inform them that EEGs and CT tests indicated that Ella had suffered a severe and irreversible brain injury and that it was unlikely that she would ever regain cognitive functions. Indeed, all of the physicians who actually evaluated Ella agreed with this assessment (and even plaintiffs' own expert conceded that this prognosis was more than likely correct). Based on this consensus, both plaintiffs expressed their desire to withdraw Ella's life support and signed a form provided by Scottish Rite, in which they specifically consented to withdraw life sustaining procedures or interventions,

---

[14] While the Advance Directive for Health Care Act (OCGA § 31-32-1 et seq.) and the Cardiopulmonary Resuscitation Act (OCGA § 31-39-1 et seq.) do not govern the issue in this matter, it is worth noting that under OCGA §§ 31-32-9 (b) and 31-39-2 (4), decisions to withdraw life support or withhold resuscitation, respectively, require input from only the attending and one other physician.

[15] *Williams v. Lemon*, 194 Ga. App. 249, 250 (2) (390 SE2d 89) (1990).

including the withdrawal of hydration and nutrition. While plaintiffs now claim that the consent form was somewhat unclear, the evidence in the record indicates that both plaintiffs were well aware of the fact that they were agreeing to the removal of all life support, including nutrition and hydration. Thus, contrary to plaintiffs' contention, our holding in *Velez* is not relevant to our inquiry here, as in that matter there was no evidence, other than the physician's own disputed recollection, that the parents consented to discontinuing their child's treatment. See *Velez*, supra, 219 Ga. App. at 680 (1).[16]

Additionally, the record contains no evidence that either Ussery or Ella's mother at any time ever revoked their consent. Continued treatment after a patient has withdrawn consent will give rise to an intentional tort claim. See *King*, supra, 274 Ga. App. at 45. However, our case law establishes clear standards for determining whether consent has been effectively withdrawn. See *Williams*, supra, 194 Ga. App. at 250 (2).

As held by this Court in a recent opinion, "[t]hose standards require that the patient act or use language which can be subject to no other inference and that these actions and utterances be such as to leave no room for doubt in the minds of reasonable men that in view of all the circumstances consent was actually withdrawn." (Punctuation omitted.) *Prince v. Esposito*.[17] Furthermore, the patient bears the burden of proving that consent was withdrawn. *Williams*, supra, 194 Ga. App. at 250 (2). Here, the record shows that when specifically asked as to whether plaintiffs ever withdrew their consent to the deescalation of Ella's life support, William Ussery responded that they had not. Given such evidence, plaintiffs cannot show that they took any action that would leave no room for doubt that they withdrew consent to the removal of Ella's life support. See id.

Regardless, plaintiffs now claim that this consent was procured by fraud, arguing that they were misled regarding Ella's condition

---

[16] During oral argument and in supplemental briefing, plaintiffs' counsel cited *In re Gianelli*, 834 NYS2d 623 (N.Y. 2007), a New York trial court opinion, in support of his claim that parental consent cannot override the law with regard to decisions to withdraw a child's life support. In *In re Gianelli*, the marked difference between the facts at issue in that matter and those at issue here renders the decision inapposite. In that case, the subject child, who was suffering from a terminal illness, retained cognitive abilities to the extent that he recognized his mother and was able to enjoy television and videos. Id. at 629. Although the child's mother and some physicians favored removing life support, other physicians were opposed. Id. In noting this important distinction, the trial court stated, "the parents, guardian ad litem, treating physicians and the hospital are not in agreement that discontinuing the ventilator is in [the child's] best interests. *Had they been, it is unlikely that this case would have necessitated judicial intervention.*" (Emphasis supplied.) Id. Accordingly, while this Court will look to cases from other jurisdictions for their persuasive value, we find this case unpersuasive as applied here.

[17] *Prince v. Esposito*, 278 Ga. App. 310, 313-314 (1) (c) (628 SE2d 601) (2006).

and regarding the amount of time it would take for her to die after life support was withdrawn. To establish such fraud in a medical context, a plaintiff "must produce evidence showing a wilful misrepresentation of a material fact, made to induce the plaintiff to act, upon which the plaintiff acts to his injury." (Punctuation omitted.) *Petzelt v. Tewes.*[18] However, nothing in the record suggests that either Dr. Jose or Scottish Rite acted with an intention to deceive plaintiffs or that either made a wilful misrepresentation with the intention and purpose of injuring Ella. See *Prince*, supra, 278 Ga. App. at 312-313 (1) (b); *Karpowicz v. Hyles.*[19]

While plaintiffs' brief speculatively alludes to fraud allegedly motivated by a desire to withdraw Ella's life support in an effort to conceal malpractice or to decrease any damages that may eventually be awarded for their malpractice claim and further alleges that this fraud was conceived in a hospital meeting the night before the parents consented, they have provided no evidence whatsoever as to what specifically was discussed, much less that anything nefarious occurred at this meeting, or even that any of the physicians involved in Ella's case attended. In fact, plaintiffs have shown no actual evidence of fraud whatsoever but, rather, attempt to rely on innuendo and speculation. However, "speculation which raises merely a conjecture or possibility is not sufficient to create even an inference of fact for consideration on summary judgment." (Punctuation omitted.) *Patterson v. Lopez.*[20]

Furthermore, the statements of Dr. Jose and the other physicians concerning Ella's condition and prognosis were based on their medical opinions and plaintiffs, again, have provided no evidence, other than rank speculation and conjecture, that those opinions constituted purposeful deceit. Indeed, fraud cannot be established through "expressions of opinion, unfulfilled predictions or erroneous conjecture as to future events." (Punctuation omitted.) *Koncul Enterprises v. Fleet Finance.*[21]

We thus find that under these specific circumstances neither Dr. Jose nor Scottish Rite committed an intentional tort under Georgia law in withdrawing Ella's life support. See *In re Jane Doe*, supra, 262 Ga. at 393 (2) (b); *McAfee*, supra, 259 Ga. at 581 (1); *In re L. H. R.*, supra, 253 Ga. at 446. At most, plaintiffs' claims question the propriety of the decision to withdraw life support and therefore may possibly form the basis of a malpractice action. See *Morton*, supra,

---

[18] *Petzelt v. Tewes*, 260 Ga. App. 802, 805 (1) (581 SE2d 345) (2003).

[19] *Karpowicz v. Hyles*, 247 Ga. App. 292, 297 (6) (543 SE2d 51) (2000).

[20] *Patterson v. Lopez*, 279 Ga. App. 840, 844 (4) (632 SE2d 736) (2006).

[21] *Koncul Enterprises v. Fleet Finance*, 279 Ga. App. 39, 42 (1) (c) (630 SE2d 567) (2006).

288 Ga. App. at 302-303 (1). Accordingly, the trial court did not err in granting Scottish Rite and Dr. Jose summary judgment as to the plaintiffs' claim that they intentionally caused Ella's death.

### Case No. A07A2223

2. In Case No. A07A2223, Scottish Rite contends that the trial court erred in denying summary judgment on the ground that plaintiffs' intentional tort claim, which was added 17 months after their initial complaint, via their amended complaint, was barred by the statute of limitation. Given our holding in Division 1, supra, that the withdrawal of Ella's life support did not constitute an intentional tort, we need not address this issue further.

3. Scottish Rite contends that the trial court erred in ruling that the hospital's incident reporting forms, termed "notification forms" and "occurrence reports," were not protected by the peer review privilege and were therefore subject to discovery. We agree.

"The standard of review of the trial court's ruling on discovery disputes is abuse of discretion." *Hickey v. Kostas Chiropractic Clinics*.[22] Bearing this standard of review in mind, the peer review privilege afforded to certain proceedings and documents is codified in OCGA § 31-7-133 (a), which provides in part:

> Except in proceedings alleging violation of this article, the proceedings and records of a review organization shall be held in confidence and shall not be subject to discovery or introduction into evidence in any civil action; and no person who was in attendance at a meeting of such organization shall be permitted or required to testify in any such civil action as to any evidence or other matters produced or presented during the proceedings or activities of such organization or as to any findings, recommendations, evaluations, opinions, or other actions of such organization or any members thereof. The confidentiality provisions of this article shall also apply to any proceedings, records, actions, activities, evidence, findings, recommendations, evaluations, opinions, data, or other information shared between review organizations which are performing a peer review function or disclosed to a governmental agency as required by law. However, information, documents, or records otherwise available from original sources are not to be construed as immune from discovery or use in any such civil action

---

[22] *Hickey v. Kostas Chiropractic Clinics*, 259 Ga. App. 222, 223 (3) (576 SE2d 614) (2003).

merely because they were presented during proceedings of such organization, nor should any person who testifies before such organization or who is a member of such organization be prevented from testifying as to matters within such person's knowledge; but such witness cannot be asked about such witness's testimony before such organization or about opinions formed by such witness as a result of the organization hearings.

The purpose of the privilege is "to foster the candor necessary for effective peer review, which is an essential element of providing quality health care services." *Freeman v. Piedmont Hosp.*[23] In determining the scope of the privilege, the Supreme Court of Georgia has concluded that the statute "placed an absolute embargo upon the discovery and use of all proceedings, records, findings and recommendations of peer review groups and medical review committees in civil litigation." (Punctuation omitted.) Id. See *Emory Clinic v. Houston*.[24] However, the statute's prohibition on the discovery of peer review materials is not unlimited. "While the statute precludes a party from discovering the proceedings and records of a peer review organization, it specifically authorizes a party to seek from original sources documents which the peer review organization examined. . . ." *Freeman*, supra, 264 Ga. at 344-345. See *Cobb County Kennestone Hosp. Auth. v. Martin*.[25]

In this matter, Scottish Rite's "notification forms"[26] were used to report unusual or unexpected occurrences as part of the hospital's incident reporting policy. In the event of such an occurrence, a hospital employee was required to prepare a notification form describing the incident and to forward the document to the director of the department where the incident occurred. The form was also required to be forwarded to the risk management department within 72 hours of the incident. The purpose of the forms is to allow the hospital's department of quality/performance improvement to make evaluations that will improve patient care. Notably, the forms on their face indicate that their purpose was for "Quality Improvement Review" as well as "Peer Review" and that they were not to be included as part of a patient's medical record.

---

[23] *Freeman v. Piedmont Hosp.*, 264 Ga. 343, 344 (444 SE2d 796) (1994).

[24] *Emory Clinic v. Houston*, 258 Ga. 434, 434-435 (1) (369 SE2d 913) (1988).

[25] *Cobb County Kennestone Hosp. Auth. v. Martin*, 208 Ga. App. 326, 327 (430 SE2d 604) (1993).

[26] Following its merger with Egleston Children's Hospital, Scottish Rite revised its incident reporting procedures. The new reporting forms are termed "occurrence reports" and serve the same purpose as the earlier notification forms.

Although no Georgia cases have specifically addressed whether hospital incident reporting documents are shielded from discovery by the peer review privilege, other jurisdictions have found such materials privileged. See *Ligouri v. Wyandotte Hosp. and Med. Center*[27] (hospital's investigative reports protected by peer review privilege); *Katherine F. v. State*[28] (investigative reports protected by medical review privilege); *Carr v. Howard*[29] (incident reports not subject to discovery due to medical peer review committee privilege); *Community Hosp. of Indianapolis v. Medtronic, Inc.*[30] (incident report not discoverable due to peer review committee privilege). In light of the nature and stated purpose of Scottish Rite's notification forms, we similarly find that these forms are exactly the type of documents protected from discovery by the peer review privilege. See *Emory Clinic*, supra, 258 Ga. at 435-436 (3). See also *Poulnott v. Surgical Assoc. of Warner Robins*.[31] Accordingly, the trial court abused its discretion in ruling that the notification forms and occurrence reports were not shielded from discovery by the peer review privilege.

4. Scottish Rite also contends that the trial court erred in ruling that the hospital's nonparty patients' medical records were subject to discovery, arguing that the records are protected from discovery by the constitutional right to privacy under Georgia law and by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA").[32] We disagree.

Personal medical records are protected by Georgia's constitutional right of privacy and cannot be disclosed without the consent of the patient unless their production is otherwise required by Georgia law. *King v. State*.[33] In the absence of a waiver, a patient must be afforded notice and an opportunity to object prior to the disclosure of his medical records via civil discovery requests. See id. at 793 (1). Here, plaintiffs served Scottish Rite with requests for production of documents, seeking nonparty patient information concerning Code Blue events for the eight-year period preceding Scottish Rite's response to the requests. Over Scottish Rite's objections, the trial court ruled that the information was subject to discovery but limited that discovery by providing that

---

[27] *Ligouri v. Wyandotte Hosp. and Med. Center*, 655 NW2d 592, 594-595 (III) (Mich. Ct. App. 2002).

[28] *Katherine F. v. State*, 723 NE2d 1016, 1018 (N.Y. 1999).

[29] *Carr v. Howard*, 689 NE2d 1304, 1315 (IV) (Mass. 1998).

[30] *Community Hosp. of Indianapolis v. Medtronic, Inc.*, 594 NE2d 448, 453 (Ind. Ct. App. 1992).

[31] *Poulnott v. Surgical Assoc. of Warner Robins*, 179 Ga. App. 138, 140 (2) (345 SE2d 639) (1986).

[32] 42 USC § 1320d et seq.

[33] *King v. State*, 272 Ga. 788, 790 (1) (535 SE2d 492) (2000).

[t]o the extent records are produced, they shall be produced *only after written notice from the Court by certified mail, return receipt requested to the adult guardians of the patients that the medical records have been requested. The notice shall state that the patient and/or his or her guardian shall have ten (10) days from the date of receipt of the notice to object to the request in writing addressed to the Court* and that the guardian may be asked to explain the objection further to the Court if the written objection is not sufficiently explanatory of the basis for the objection. The notice shall further state that the records of those patients who have not objected within ten (10) days of the date of the receipt of the notice shall be produced in their entirety subject to application of other privileges. The Hospital shall give notice to the Plaintiff's counsel of any documents withheld from production on the grounds of privilege and shall state the applicable privilege.

(Emphasis supplied.) Given the fact that the trial court's orders requiring the production of Scottish Rite's nonparty medical records affords the nonparty patients with notice and an opportunity to object to the disclosure and also provides that the court will conduct a further review to determine the scope of discovery for this information after the initial identification of the nonparty records relevant to plaintiffs' request, we find no abuse of discretion. See *Hickey*, supra, 259 Ga. App. at 224 (3) (a). See also *Nat. Stop Smoking Clinic-Atlanta v. Dean*.[34]

Furthermore, we do not agree with Scottish Rite's contention that discovery of the requested medical records is barred by HIPAA. Under that statute, even where no HIPAA-compliant written authorization for medical records exists, "disclosure is permitted either *in response to a court order* or in response to a subpoena, discovery request, or other lawful process." (Punctuation omitted; emphasis supplied.) *Northlake Med. Center v. Queen*.[35] See 45 CFR § 164.512 (e) (1) (i), (ii).

Here, the trial court's order which affords the nonparty patients with notice and an opportunity to object to disclosure and also stipulates that the court will conduct further review once the relevant records are identified complies with HIPAA requirements for the disclosure of such records. See 45 CFR § 164.512 (e) (1) (i), (ii). Accordingly, the trial court did not abuse its discretion in ruling that

---

[34] *Nat. Stop Smoking Clinic-Atlanta v. Dean*, 190 Ga. App. 289, 290 (378 SE2d 901) (1989).
[35] *Northlake Med. Center v. Queen*, 280 Ga. App. 510, 514 (2) (634 SE2d 486) (2006).

Scottish Rite is required to produce the nonparty patient medical records in compliance with the court's specific orders establishing the scope of this production.

### Case No. A07A2224

5. In Case No. A07A2224, Dr. Jose and his employer contend that the trial court erred in denying summary judgment on the ground that plaintiffs' intentional tort claim was barred by the applicable statute of limitation. As previously stated, given our holding in Division 1, supra, that the withdrawal of Ella's life support did not constitute an intentional tort, we need not address this issue further.

6. Dr. Jose and his employer further contend that the trial court erred in denying their motion for summary judgment as to plaintiffs' professional malpractice claim. Specifically, they argue that Dr. Jose cannot be held liable for professional malpractice in connection with the Code Blue incident that caused Ella's initial injury because there is no evidence that he had maintained a physician-patient relationship with Ella at the time of the incident, which means that he owed her no duty of care. We disagree.

"Georgia law is clear that physician-patient privity is an absolute requirement for the maintenance of a professional malpractice action." *Schrader v. Kohout.*[36] "Doctor-patient privity is essential because it is this relation which is a result of a consensual transaction that establishes the legal duty to conform to a standard of conduct." (Punctuation omitted.) *Harris v. Griffin.*[37] "The relationship is considered consensual where the patient knowingly seeks the assistance of the physician and the physician knowingly accepts him as a patient." (Punctuation omitted.) *Schrader*, supra, 239 Ga. App. at 136.

Here, Dr. Jose concedes that he established a physician-patient relationship with Ella during the time she was in ICU-A immediately after her surgery on March 16 but argues that this relationship ended once Ella was moved to ICU-C, and therefore he owed her no duty of care at the time of the Code Blue incident. However, Dr. Jose's notes on the date Ella was transferred from ICU-A to ICU-C indicate that he examined her that day and that the plan for her treatment was to "[c]ontinue current care and observation." Furthermore, Ella's mother testified that earlier in the evening before the Code Blue incident, Dr. Jose examined Ella, discussed the throat spasms that Ella was experiencing, and promised to treat Ella if the spasms reoccurred.

---

[36] *Schrader v. Kohout*, 239 Ga. App. 134, 135 (522 SE2d 19) (1999).

[37] *Harris v. Griffin*, 272 Ga. App. 216, 219 (612 SE2d 7) (2005).

Given this conflicting evidence as to the extent of Dr. Jose's relationship with Ella after she transferred to ICU-C, there remain genuine issues of material fact regarding whether Dr. Jose still owed Ella a duty of care at the time of the Code Blue incident. See *Harris*, supra, 272 Ga. App. at 219-220. Accordingly, the trial court did not err in denying Dr. Jose's motion for summary judgment on this issue.

In summary, in Case No. A07A2222, we affirm the trial court's grant of summary judgment to Scottish Rite, Dr. Jose, and Dr. Jose's employer as to plaintiffs' intentional tort claim, because we find that the trial court did not err in holding that the actions taken by the hospital and Dr. Jose under these circumstances did not constitute an intentional tort under Georgia law.

In Case No. A07A2223, we reverse the trial court's ruling that Scottish Rite's notification forms and occurrence reports were not protected from discovery by the peer review privilege. However, we affirm the trial court's order requiring Scottish Rite to produce the nonparty patient medical records in accordance with the trial court's orders outlining the scope of that production.

Finally, in Case No. A07A2224, we affirm the trial court's denial of Dr. Jose's and his employer's motion for summary judgment on the issue of whether Dr. Jose owed Ella a duty of care at the time of her initial injury.

*Judgments affirmed in part and reversed in part. Ruffin, J., concurs. Bernes, J., concurs specially and fully in all divisions except Division 1 (b), in which she concurs in the judgment only.*

BERNES, Judge, concurring specially and fully.

I concur fully with Divisions 1 (a), 1 (c), 2, 3, 4, 5, and 6 of the majority opinion. I concur in the judgment only with respect to Division 1 (b).

While concurring fully with Division 1 (a), I write separately to emphasize that although the Supreme Court of Georgia has pointed out that the propriety of discontinuing life support involves a case-specific inquiry, the Supreme Court nevertheless has delineated the contours of where discontinuance can be considered appropriate. Specifically, Georgia precedent establishes that the consent of an incompetent patient's family or guardian to the discontinuance of life support is valid if the patient is terminally ill facing imminent death, or if the patient "has no reasonable possibility of regaining cognitive functions." *DeKalb Med. Center v. Hawkins*, 288 Ga. App. 840, 843 (1) (655 SE2d 823) (2007). See *In re Jane Doe*, 262 Ga. 389 (418 SE2d 3) (1992); *In re L. H. R.*, 253 Ga. 439 (321 SE2d 716) (1984). Here, the uncontroverted evidence of record reflects that Ella Ussery had no reasonable possibility of regaining cognitive functions, and so the parental consent to discontinue life support obtained by the hospital

was valid under the standard set out in Georgia case law. Accordingly, I agree with the majority that summary judgment was appropriate on the plaintiffs' intentional tort claim.

We need not reach the issue of whether the two-physician requirement set forth in *In re L. H. R.*, 253 Ga. at 446, was overruled by *In re Jane Doe*, 262 Ga. 389. That question should be pretermitted because, as the majority notes, the uncontroverted evidence shows that the decision to discontinue life support for Ella involved the consultation of two other nontreating physicians. For this reason, I concur in judgment only with regard to Division 1 (b).

DECIDED JANUARY 23, 2008.

*Kirschner & Venker, Andrew R. Kirschner, Thomas J. Venker*, for appellants.

*Peters & Monyak, Jonathan C. Peters, Melissa B. Johnson, Hall, Booth, Smith & Slover, John E. Hall, Jr., Jason D. Hergenroether, Terrell W. Benton III*, for appellees.